**2024-2292**

# United States Court of Appeals for the Federal Circuit

NIMBELINK CORP.,

*Plaintiff-Appellant,*

v.

DIGI INTERNATIONAL INC.,

*Defendant-Appellee.*

*Appeal from the United States District Court for the District of Minnesota, in Case No. 0:22-cv-02345-NEB-DJF*

## BRIEF OF APPELLANT

Devan V. Padmanabhan
Paul J. Robbennolt
Erin O. Dungan
Mariah L. Reynolds
Britta S. Loftus
Padmanabhan & Dawson, PLLC
9800 Shelard Parkway, Suite 120
Minneapolis, MN 55441
(612) 444-3601
devan@paddalawgroup.com
paul@paddalawgroup.com
erin@paddalawgroup.com
mariah@paddalawgroup.com
britta@paddalawgroup.com

November 5, 2024

**UNITED STATES PATENT NO. 9,497,570 B2**

**CLAIM 1**

1. A space-efficient cellular modem device for machine-to-machine communications, the modem device comprising:

a multi-layer printed circuit board defining a top side and a bottom side and including a first circuit layer adjacent the top side, a second circuit layer adjacent the bottom side, a ground plane layer, and a power plane layer, the ground and power plane layers located between the first and second circuit layers;

a cellular transceiver module configured to communicate over a cellular wireless cellular network, the cellular transceiver module comprising a processor and attached to a top side of the multi-layer printed circuit board;

electrical power-management components attached to the multi-layer printed circuit board, the power-management components in electrical communication with the cellular transceiver module;

a first plurality of electrically-conductive pins in electrical connection with the cellular transceiver module and aligned along a first pin axis to form a first row of pins, each of the first plurality of pins extending outwardly and away from the bottom side of the multi-layer printed circuit board;

a second plurality of electrically-conductive pins in electrical connection with the cellular transceiver module and aligned along a second pin axis to form a second row of pins, each of the second plurality of pins extending outwardly and away from the bottom side of the multi-layer printed circuit board, the second row of pins located opposite the first row of pins; and

a communications port in electrical communication with the cellular transceiver module, the communications port configured to receive and transmit communication signals over the cellular wireless network.

## UNITED STATES PATENT NO. 9,838,066

## CLAIM 1

1. A space-efficient cellular modem device for machine-to-machine communications, the modem device comprising:

a multi-layer printed circuit board defining a first side and a second side and including at least four layers, the four layers including a first layer including one or more circuits, a second layer including a ground plane, a third layer including a power plane, and a fourth layer including one or more circuits, wherein the first layer is soldermasked to form the first side of the multi-layer printed circuit board, the second layer is between the first layer and the fourth layer, the third layer is between the first layer and the fourth layer, and the fourth layer is soldermasked to form the second side of the multi-layer printed circuit board;

a cellular transceiver module configured to communicate over a cellular wireless network, the cellular transceiver module comprising a processor and attached to the first side of the multi-layer printed circuit board;

electrical power-management components attached to the multi-layer printed circuit board, the power-management components in electrical communication with the cellular transceiver module;

a first plurality of electrically-conductive pins aligned along a first pin axis to form a first row of pins, each of the first plurality of pins extending outwardly and away from the multi-layer printed circuit board, one or more of the first plurality of electrically-conductive pins in electrical connection with the cellular transceiver module and one or more of the first plurality of electrically-conductive pins in electrical connection with the electrical power-management components;

a second plurality of electrically-conductive pins aligned along a second pin axis to form a second row of pins, each of the second plurality of pins extending outwardly and away from the multi-layer printed circuit board, the second row of pins located opposite the first row of pins; and

a communications port in electrical communication with the cellular transceiver module, the communications port configured to receive and transmit communication signals over the cellular wireless network.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 24-2292

**Short Case Caption** NimbeLink Corp. v. Digi International Inc.

**Filing Party/Entity** NimbeLink Corp.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/05/2024 Signature: /s/Devan V. Padmanabhan

Name: Devan V. Padmanabhan

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☑ None/Not Applicable |
| NimbeLink Corp. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iv

STATEMENT OF RELATED CASES ........ ix

JURISDICTIONAL STATEMENT ........ 1

STATEMENT OF THE ISSUES ........ 2

STATEMENT OF THE CASE ........ 3

I. NIMBELINK AND THE PATENTS-IN-SUIT ........ 6

II. THE TECHNOLOGY OF THE PATENTS-IN-SUIT ........ 7

III. DIGI'S USE OF NIMBELINK'S CONFIDENTIAL INFORMATION AND PATENTED TECHNOLOGY TO INTRODUCE ITS OWN INFRINGING EMBEDDED CELLULAR MODEMS ........ 10

IV. NIMBELINK'S LITIGATION AGAINST DIGI ........ 13

A. The District Court's Dismissal of Counts III and IV ........ 13

B. The District Court's Indefiniteness Finding and Judgment of Invalidity of the Claims of the Patents-in-Suit ........ 14

SUMMARY OF THE ARGUMENT ........ 16

ARGUMENT ........ 18

I. THE DISTRICT COURT ERRED IN FINDING THAT "SPACE-EFFICIENT CELLULAR MODEM DEVICE" IS INDEFINITE ........ 18

A. Standard of Review: De Novo ........ 18

B. The Relevant Legal Standards ........ 18

C. "Space-Efficient Cellular Modem Device" Is Not Indefinite ........ 20

1. "Space-Efficient" Refers to the Size of the "Cellular Modem Device" ........ 21

a) The Patents-in-Suit Clearly Disclose that "Space-Efficient" Refers to the Size of the "Cellular Modem Device" ........ 21

b) The District Court Erroneously Concluded that "Space-Efficient" Could Refer to "the Efficient Spacing of Surface-Mounted Components, Connectors, and Interfaces." .................................... 27

2. The Patents-in-Suit Provide Sufficient Guidance to a Person of Skill in the Art Regarding the Meaning of "Space-Efficient" ............ 29

D. If "Space-Efficient Cellular Modem Device" Were Indefinite, It Would Not be Limiting ..................................................................... 30

II. THE DISTRICT COURT ERRED IN REFUSING TO CONSTRUE "SPACE-EFFICIENT CELLULAR MODEM DEVICE" TO MEAN "A CELLULAR MODEM DEVICE INCORPORATING A MULTI-LAYER PCB AND WITH A FOOTPRINT CONSISTENT WITH THE FOOTPRINT OF AN XBEE FORM FACTOR" ......................................... 32

A. Standard of Review: De Novo ................................................................ 32

B. The Relevant Legal Standards ............................................................... 32

C. The Proper Construction of "Space-Efficient Cellular Modem Device" Is "a Cellular Modem Device Incorporating a Multi-Layer PCB and With a Footprint Consistent With the Footprint of an XBee Form Factor" ................................................................................................. 34

D. The District Court Incorrectly Rejected NimbeLink's Proposed Construction ............................................................................................ 41

1. The District Court Improperly Ignored the Teachings of the Specification Regarding the Meaning of "Space-Efficient Cellular Modem Device" ........................................................................... 41

2. It Is Irrelevant that the Patents Do Not Use the Phrase "Footprint of an XBee Form Factor" ..................................................................... 42

3. The File History Does Not Justify the District Court's Rejection of NimbeLink's Proposed Construction ................................................ 43

III. THE DISTRICT COURT ERRED IN DISMISSING NIMBELINK'S BREACH OF CONTRACT CLAIMS FOR FAILURE TO STATE A CLAIM FOR RELIEF ........................................................................... 44

A. Standard of Review: De Novo ................................................................ 44

B. The Relevant Legal Standards ........ 44

C. The District Court Erred When it Dismissed NimbeLink's Breach of Contract Claims for Failure to State a Claim ........ 46

1. NimbeLink's Complaint Adequately Pled the Nature of the Confidential Information at Issue ........ 47

2. NimbeLink's Complaint Adequately Pled Digi's Unauthorized Use of NimbeLink's Confidential Information to Develop and Launch Its Own Competitive Cellular Modem Product ........ 50

CONCLUSION AND RELIEF SOUGHT ........ 53

# TABLE OF AUTHORITIES


**Case** **Page(s)**

*Affordable Communities of Mo. v. Federal Nat'l Mortg. Ass'n*, 714 F.3d 1069 (8th Cir. 2013) ....................44

*Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336 (Fed. Cir. 2002) ....................31

*Amarin Pharma, Inc. v. Hikma Pharms. USA Inc.*, 104 F.4th 1370 (Fed. Cir. 2024) ....................51

*American Med. Systs., Inc. v. Biolitic, Inc.*, 618 F.3d 1354 (Fed. Cir. 2010) ....................31

*Arctic Cat Inc. v. Polaris Indus. Inc.*, No.16-cv-0010 (WMW/HB), 2017 WL 11679225 (D. Minn. Dec. 20, 2017) ...31

*BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360 (Fed. Cir. 2017) ....................18

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)....................45

*Biosig Insts., Inc. v. Nautilus, Inc.*, 783 F.3d 1374 (Fed. Cir. 2015) ....................27

*Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009) ....................53

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801 (Fed. Cir. 2002)....................30

*ClearOne, Inc. v. Shure Acquistion Holdings, Inc.*, 35 F.4th 1345 (Fed. Cir. 2022) ....................27

*Cleveland Clinic Found. v. True Health Diags. LLC*, 859 F.3d 1352 (Fed. Cir. 2017) ....................44

*Dingxi Longhai Diary, Ltd. v. Becwood Tech. Grp. L.L.C.*,
635 F.3d 1106 (8th Cir. 2011) ....................51

*Disc Disease Sols. Inc. v. VGH Sols., Inc.*,
888 F.3d 1256 (Fed. Cir. 2018) ....................44

*Dorset Indus., Inc. v. Unified Grocers, Inc.*,
893 F.Supp.2d 395 (E.D. N.Y. 2012) .................... 14, 49, 50

*Enzo Biochem, Inc. v. Applera Corp.*,
599 F.3d 1325 (Fed. Cir. 2010) .................... 21, 24

*Gillespie v. Dywidag Systs. Int'l, USA*,
501 F.3d 1285 (Fed. Cir. 2007) ....................41

*Guangdong Alison Hi-Tech Co. v. International Trade Comm'n*,
936 F.3d 1353 (Fed. Cir. 2019) .................... 19, 25

*Horras v. American Cap. Strategies, Ltd.*,
729 F.3d 798 (8th Cir. 2013) ....................45

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014) .................... 19, 23

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
424 F.3d 1374 (Fed. Cir. 2005) ....................19

*Ironburg Inventions Ltd. v. Valve Corp.*,
64 F.4th 1274 (Fed. Cir. 2023) ....................18

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
175 F.3d 985 (Fed. Cir. 1999)....................33

*Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*,
848 N.W.2d 539 (Minn. 2014)....................45

*Mantech Envtl. Corp. v. Hudson Envtl. Serv., Inc.*,
152 F.3d 1368 (Fed. Cir. 1998) ....................33

*Media Rts. Techs., Inc. v. Capital One Fin. Corp.*,
800 F.3d 1366 (Fed. Cir. 2015)....................................................................20

*Nautilus, Inc. v. Biosig Instrs., Inc.*,
572 U.S. 898 (2014)...................................................................... 19, 20

*Neonode Smartphone LLC v. Samsung Electronics Co., Ltd.*,
No. 2023-2304, 2024 WL 3873566 (Fed. Cir. Aug. 20, 2024)...........................27

*Nevro Corp. v. Boston Sci. Corp.*,
955 F.3d 35 (Fed. Cir. 2020)....................................................................28

*Niazi Lic. Corp. v. St. Jude Med. S.C., Inc.*,
30 F.4th 1339 (Fed. Cir. 2022) ..................................................... passim

*Optical Disc. Corp. v. Del Mar Avionics*,
208 F.3d 1324 (Fed. Cir. 2000) ..................................................................34

*Park Nicollet Clinic v. Hamann*,
808 N.W.2d 828 (Minn. 2011)....................................................................45

*Pension Advisory Grp., Ltd. v. Country Life Ins. Co.*,
771 F.Supp.2d 680 (S.D. Tex. 2011)........................................................ 14, 52

*Pfizer, Inc. v. Ranbaxy Labs., Ltd.*,
457 F.3d 1284 (Fed. Cir. 2006) .............................................................. 15, 41

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ....................................................... 33, 40, 41

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
182 F.3d 1298 (Fed. Cir. 1999) ..................................................................34

*Praxair, Inc. v. ATMI, Inc.*,
543 F.3d 1306 (Fed. Cir. 2008) ..................................................................18

*Schlief v. Nu-Source, Inc.*,
No. 10-cv-4477 (DWF/SER) 2011 WL 1560672 (D. Minn. 2011) ............ 13, 50

*SFA Systs., LLC v. 1-800-Flowers.com, Inc.*,
940 F.Supp.2d 433 (E.D. Tex. 2013)..........31

*SimpleAir, Inc. v. Sony Ericsson Mobile Comms. AB*,
820 F.3d 419 (Fed. Cir. 2016)..........32

*Sleep Number Corp. v. Young*,
507 F.Supp.3d 1081 (D.Minn. 2020).......... 47, 48

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
844 F.3d 1370 (Fed. Cir. 2017) .......... 18, 21, 25

*Swanson v. Citibank, N.A.*,
614 F.3d 400 (7th Cir. 2010) ..........53

*Swierkiewicz v. Sorema N.A.*,
534 U.S. 506 (2002)..........51

*Teleflex, Inc. v. Ficosa North Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002) ..........33

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015)..........32

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015) ..........32

*Thorner v. Sony Comp. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ..........33

*Topchian v. JPMorgan Chase Bank, N.A.*,
760 F.3d 843 (8th Cir. 2014) ..........45

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Corp.*,
308 F.3d 1167 (Fed. Cir. 2002) ..........33

*United States v. Black Hills Tree Farm*,
No. CIV. 09-5049-JLV, 2011 WL 1044376 (D.S.D. Mar. 17, 2011) ..........53

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996).................................................................. 32, 33, 41

*Waldron v. Boeing Co.*,
388 F.3d. 591 (8th Cir. 2004) ..........................................................................45

*Warden v. McLelland*,
288 F.3d 105 (3d Cir. 2002)..............................................................................52

*Zimmer Spine*, *Inc. v. Wainwright*,
Civ. No. 10-cv-4725 (JNE/JSM), 2011 WL 3035133 (D.Minn. July 7, 2011)...53

*Zutz v. Nelson*,
601 F.3d 842 (8th Cir. 2010) ............................................................................44

## STATEMENT OF RELATED CASES

This is an appeal from orders and a final judgment of the United States District Court for the District of Minnesota in Case No. 0:22-cv-2345-NEB-DJF granting dismissal of Appellant NimbeLink Corp.'s ("NimbeLink") breach of contract claims and granting summary judgment of invalidity of NimbeLink's U.S. Patent Nos. 9,497,570 B2 ("the '570 Patent") and 9,838,066 B2 ("the '066 Patent") (collectively, the "Patents-in-Suit") in favor of Appellee Digi International, Inc. ("Digi"). No other appeal in or from the same civil action or proceeding was previously before this or any other appellate court.

No other case known to counsel to be pending in this or any other tribunal will directly affect or be directly affected by this Court's decision in the pending case.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over NimbeLink's patent infringement claims pursuant to 28 U.S.C. §§ 1331 and 1338(a). The district court had supplemental jurisdiction over NimbeLink's Minnesota state law claims for breach of contract and unjust enrichment pursuant to 28 U.S.C. § 1367(a).

This Court has jurisdiction under 28 U.S.C. § 1295(a)(1), because this is an appeal from a final decision of a district court of the United States in a civil action arising under the Patent Act.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in holding that the preamble limitation "space-efficient cellular modem device" is indefinite, where the written description, drawings, and claims of the Patents-in-Suit make clear that "space-efficient" refers to the size of the cellular modem device and provide examples of sizes of cellular modem devices that fall within the scope of the "space-efficient" claim term.

2. Whether the district court erred in refusing to construe the preamble limitation "space-efficient cellular modem device" as "a cellular modem device incorporating a multi-layer PCB and with a footprint consistent with the footprint of an XBee form factor."

3. Whether the district court erred in dismissing NimbeLink's breach of contract claims for failure to state a claim, where NimbeLink's complaint adequately pleads both: (1) the nature of NimbeLink's confidential information that was subject to the parties' non-disclosure agreements; and (2) that Digi used NimbeLink's confidential information without authorization in Digi's decision to develop, manufacture, and sell its own embedded cellular modem products in competition with NimbeLink and in formulating Digi's market strategies for those embedded cellular modem products.

## STATEMENT OF THE CASE

The district court erred in holding that the phrase "space-efficient cellular modem device," which appears in the preamble of every claim of the Patents-in-Suit, is indefinite, thereby invalidating the claims. The heart of the district court's analysis was its conclusion that "space-efficient cellular modem device" could refer to "(1) the efficient spacing of surface-mounted components, connectors, and interfaces or (2) the size of the modem," and that the specification does not clearly indicate which meaning is intended. Appx21. But this finding is erroneous: there is no support in the Patents-in-Suit or in their file histories for a conclusion that "space-efficient cellular modem device" refers to the "efficient spacing" of components of the cellular modem device. The district court relied on a single sentence in the specification, explaining that a "multi-layer [printed circuit board] "allows for efficient spacing of surface-mounted components, connectors, and interfaces …." Appx17, *quoting* Appx101 at 4:31-33 ('570 Patent).[1] But the "efficient spacing" of components on the printed circuit board ("PCB") is not the same as a "space-efficient cellular modem."

The evidence that "space-efficient cellular modem device" refers to the size of the cellular modem device, on the other hand, is overwhelming. In fact, the

[1] Because the specifications of the '570 and '066 Patents are nearly identical, NimbeLink will cite only to the specification of the '570 Patent for simplicity.

specification makes this meaning explicit, referring to the "space-efficient size" of the claimed cellular modem device. Appx102 at 5:3-6. Moreover, the Patents-in-Suit provide persons of skill in the art with ample guidance on the range of sizes that satisfy the "space-efficient" requirement. The specification repeatedly refers to the invention as "XBee-sized" or consistent with "an XBee form factor"—referring to a well-known group of products with standard sizes—and even provides examples of dimensions for the cellular modem devices that fall within the scope of the claims and, therefore, the "space-efficient" term. The claims of the Patents-in-Suit, viewed in light of the specification and the file histories, clearly inform persons of skill in the art about the scope of the claims with reasonable certainty, and are therefore not indefinite. Regardless of the proper construction of "space-efficient cellular modem device," therefore, the district court's determination that the preamble claim term is indefinite and its resulting judgment of invalidity must be reversed.

The Patents-in-Suit also provide this Court with sufficient evidence to construe "space-efficient cellular modem device." The written description, the drawings, and certain dependent claims all provide examples of sizes of cellular modems that fall within the scope of the "space-efficient" term; any construction of "space-efficient cellular modem" must therefore include at least these sizes. Here, again, the Patents-in-Suit teach persons of skill in the art the ranges of sizes

of modems that are ”space-efficient” within the meaning of the claims. The specification repeatedly emphasizes that the claimed cellular modems are “XBee-sized” and consistent with “an XBee form factor.” Where the Patents-in-Suit provide examples of dimensions of the claimed cellular modem devices, those examples are all consistent with the well-known dimensions of the XBee line of products. Accordingly, the proper construction of “space-efficient cellular modem device” is “a cellular modem device incorporating a multi-layer PCB and with a footprint consistent with the footprint of an XBee form factor.” The district court rejected that construction on the grounds that adopting it “would improperly import limitations from the specification into the claims,” Appx24, but that claim construction principle, which cautions against improperly **narrowing** the scope of the claims, does not justify ignoring explicit examples of embodiments of the invention when construing the claims. Therefore, this Court should construe “space-efficient cellular modem device” as set forth above.

Finally, the district court erred in dismissing NimbeLink’s claims alleging that Digi breached the parties’ non-disclosure agreements by using, without authorization, NimbeLink’s confidential information in deciding to develop and launch its own competitive cellular modem products, and in formulating its market strategies for those competing products. NimbeLink’s factual allegations comply with Rule 8 and put Digi on notice regarding the nature of NimbeLink’s claims and

the basis therefor. Specifically, contrary to the district court's findings, NimbeLink's complaint adequately pleads allegations describing the nature of the confidential information subject to the non-disclosure agreements that is at issue, and adequately pleads allegations that Digi used that confidential information without authorization in deciding to develop and launch its own competitive cellular modem devices and in formulating its market strategies for those products. Accordingly, this Court should reverse the district court's dismissal of NimbeLink's breach of contract claims, and should remand those claims to district court for further proceedings.

## I. NIMBELINK AND THE PATENTS-IN-SUIT

NimbeLink designs, manufactures, and sells devices that connect physical objects to the "Internet of Things," a network of devices that allows for the collection and exchange of data. NimbeLink's products include embedded cellular modems— modems that can be incorporated into other devices to allow those devices to communicate with other machines or computers over a cellular network. Appx100 at 1:11-15, 1:36-38.

NimbeLink's co-founder, Kurt Larson, and his co-inventor, Christopher Elmquist, invented and designed a line of such embedded cellular modems called Skywire™ modems. Appx133 at ¶ 9. The primary advantage of the Skywire™

modem is its small size; when it was introduced, NimbeLink believed the Skywire™ to be the smallest embedded cellular modem on the market. *Id.*

To protect its innovative products and technology, NimbeLink applied for and obtained several patents, including the Patents-in-Suit. On February 6, 2014, NimbeLink filed U.S. Provisional Patent Application No. 61/936,651 ("the '651 Provisional"), which described space-efficient cellular modems such as the Skywire™ product. Appx610-647. NimbeLink subsequently filed U.S. Patent Application No. 14/616,118, which claimed priority to the '651 Provisional, on November 14, 2016. Appx77. That application issued as the '570 Patent on November 15, 2016. *Id*. On November 14, 2016, NimbeLink filed a continuation application claiming priority to the '570 Patent, U.S. Patent Application No. 15/350,205. Appx104. The '205 Application issued on December 5, 2017, as the '066 Patent. *Id*.

## II. THE TECHNOLOGY OF THE PATENTS-IN-SUIT

The patentees of the Patents-in-Suit do not claim to have invented modems, or even embedded cellular modems. In fact, the Patents-in-Suit explicitly state that "the use of embedded cellular modems … is generally known." Appx100 at 1:28-29. The invention of the Patents-in-Suit instead rests in the provision of the claimed features in a small-sized modem.

Prior to the invention of the Patents-in-Suit, non-cellular modems could be quite small. For example, prior to 2006, a company called MaxStream introduced RF (non-cellular, radio frequency protocol) modems that were in an "XBee" form factor. Appx1992. In 2006, Digi acquired MaxStream and its line of XBee RF modem products. *Id.* The "XBee form factor" refers to these devices' size, shape, and other physical characteristics. Appx740-741 at ¶ 9. The footprints, *i.e.*, the space those modems take up on the surface to which they are attached, of exemplary XBee RF modems are 27.61 mm by 24.38 mm and 32.94 mm by 24.38 mm. Appx741-742 at ¶ 10; Appx733-738.

Embedded cellular modems existed prior to the inventions of the Patents-in-Suit as well. Appx100 at 1:28-29. Making cellular modems smaller, though, compared to making non-cellular modems like the XBee RF modems smaller, presents engineering and design challenges. Appx743 at ¶ 13. Cellular modems require significantly more power than non-cellular modems such as the XBee RF modems. *Id.* Supplying that power to cellular modems requires more, and often larger, components, which necessarily makes it more difficult to make the end product modem device smaller. *Id.* Additionally, the transceiver of a cellular modem generates a strong signal; if that factor is not accounted for in the design of the product, the signal may interfere with the operation of the device. *Id.* Similarly, the signals from other components of the modem could interfere with the

transceiver. *Id.* All of these factors contribute to the difficulty of making smaller embedded cellular modems.

As a result, prior to the invention of the Patents-in-Suit, embedded ***cellular*** modems were relatively large. *See* Appx100 at 1:28-32 (prior embedded cellular modems "typically require a large footprint"). For example, the embedded cellular modems offered by companies called Janus and Multi-Tech were considerably larger than the XBee footprint described in the Patents-in-Suit. *See, e.g.*, Appx2323-2324 at 186:9-187:15 (co-inventor Elmquist confirming that neither the Janus nor the Multi-Tech products were in an XBee form factor; larger embedded modems meant that users' "design had to be a lot bigger to accommodate the board"); Appx2326-2327 (inventor Elmquist stating in 2015 that the Janus cellular modems are "huge" compared to NimbeLink's Skywire product); Appx2332-2334 at 120:13-122:22 (president of the manufacturer of the Janus embedded cellular modem testifying that the XBee-form-factor NimbeLink Skywire products were "considerably smaller" than the Janus embedded modem products). Digi considered NimbeLink's Skywire product to be a "head-to-head" competitor of Digi's accused XBee cellular modem products, but did not consider the larger embedded cellular modem products, such as those offered by Multi-Tech, to be direct competitors. Appx2343-2344 at 236:4-237:15.

It was in this context that the inventors of the Patents-in-Suit developed the novel embedded cellular modem that is described and claimed in those patents. The claimed embedded cellular modem not only has the structures and features that are recited in the claims of the Patents-in-Suit, but it was much smaller—more "space-efficient"—than existing embedded cellular modems. When they invented their embedded cellular modem, the inventors of the Patents-in-Suit believed they had created the first ever cellular modem conforming to the XBee form factor, and the "smallest [embedded cellular modem] on the market." *See* Appx648 (marketing materials attached to the '651 Provisional Patent Application); Appx2322 at 170:15-23 (co-inventor Elmquist testifying "I went into it when they started talking about [a] patent thinking that we were doing something different because we were the first ones to put cellular on that [XBee] footprint"). In fact, Digi itself had first tried to develop an XBee cellular modem product in 2012, but was unsuccessful in doing so. Appx2339-2342 at 78:21- 81:10. Only in January 2017, after NimbeLink had patented and launched its XBee Skywire cellular modem, did Digi launch its own line of XBee cellular modem products. Appx138 at ¶ 36.

## III. DIGI'S USE OF NIMBELINK'S CONFIDENTIAL INFORMATION AND PATENTED TECHNOLOGY TO INTRODUCE ITS OWN INFRINGING EMBEDDED CELLULAR MODEMS

In the Spring of 2015, while the application for the '570 Patent was pending, Digi approached NimbeLink and requested NimbeLink's assistance with the

development of a Digi product that would incorporate the Skywire™ product. Appx135 at ¶ 16. NimbeLink and Digi entered into a non-disclosure agreement on June 18, 2015 (the "2015 NDA"). *Id.* at ¶ 17. Digi subsequently expressed an interest in acquiring NimbeLink, and asked NimbeLink to educate Digi regarding the Skywire™ product, NimbeLink's process for obtaining certification from cellular carriers such as Verizon and T-Mobile, the market for the Skywire™ product, and NimbeLink's understanding of the market opportunities and basic business strategies for embedded cellular modems. *Id.* at ¶ 18. The parties' discussions continued through January 2016. *Id.* at ¶ 19. In December 2015, NimbeLink representatives met twice in person with Digi executives and employees to discuss the Skywire™ product. *Id.* Pursuant to the 2015 NDA, NimbeLink provided Digi with confidential and proprietary information, including technical information regarding its Skywire™ product and detailed business and market strategy information that underlies the market success of the Skywire™ product. *Id.*

In January 2016, Digi informed NimbeLink that it no longer had interest in acquiring NimbeLink. Appx136 at ¶ 20. Digi and NimbeLink continued to discuss the potential licensing of the Skywire™ product and related intellectual property by Digi through July 2016, when the negotiations ended without any license agreement. *Id.* at ¶ 21.

In late 2016, Digi again expressed interest in acquiring NimbeLink and requested detailed financial information about the Skywire™ product and information about the market for that product. *Id.* at ¶ 22. The parties entered into a second written non-disclosure agreement on November 28, 2016 (the "2016 NDA"). *Id.* NimbeLink subsequently provided to Digi pursuant to the 2016 NDA the detailed financial and market information that it had requested. *Id.* Digi ultimately did not acquire NimbeLink. *Id.* at ¶ 23.

During the terms of the 2015 NDA and the 2016 NDA, Digi used NimbeLink's Confidential and Proprietary Information without authorization for non-permitted uses, including for the purposes of developing its own cellular modem products and entering the market with those products. Appx137 at ¶¶ 27, 33. In January 2017, Digi announced the introduction of its XBee® Cellular modem, a device that is nearly identical to NimbeLink's Skywire™ product. Appx138 at ¶ 36. Over the next several years, Digi expanded its XBee® Cellular modem product line, offering several additional products that are compatible with various cellular communications standards (the "Accused Products"). *Id.* Notably, in deciding to develop, manufacture, and sell the Accused Products, and in formulating its market strategies for the Accused Products, Digi used, without authorization, the confidential information that NimbeLink had provided to Digi pursuant to the 2015 NDA and the 2016 NDA. *Id.* at ¶ 37. These unauthorized uses

of NimbeLink's confidential information constituted breaches of the 2015 NDA and the 2016 NDA. *Id.*

## IV. NIMBELINK'S LITIGATION AGAINST DIGI

On September 23, 2022, NimbeLink commenced this litigation against Digi. Appx131-159. Counts I and II asserted that Digi's XBee Cellular Modem products infringe the '570 and '066 Patents, respectively. Appx152-155. Count III alleged that Digi breached the 2015 NDA, and Count IV alleged that Digi infringed the 2016 NDA. Appx155-156. NimbeLink alleged a fifth count of unjust enrichment, in the alternative to NimbeLink's breach of contract claims. Appx156-157.

### A. The District Court's Dismissal of Counts III and IV

In lieu of answering NimbeLink's complaint, Digi moved pursuant to Rule 12(b)(6) to dismiss NimbeLink's breach of contract counts for failure to state a claim. Appx220. The district court granted Digi's motion and dismissed Counts III and IV of NimbeLink's complaint. Appx29-37. Specifically, the district court held that NimbeLink's complaint had not adequately alleged breach of contract claims because it did not "offer any factual allegations suggesting the nature of the confidential information Digi allegedly used." Appx34-35, *citing Schlief v. Nu-Source, Inc.*, No. 10-cv-4477 (DWF/SER), 2011 WL 1560672, at *4 (D. Minn. Apr. 25, 2011) (plaintiff "must plead facts identifying the type of … confidential information" to state breach of confidentiality agreement claim) and *Dorset Indus.,*

*Inc. v. Unified Grocers, Inc.*, 893 F.Supp.2d 395, 411-12 (E.D. N.Y. 2012) (complaint properly pled breach of confidentiality agreement where it described alleged confidential information as "checkout counter programs and its business model, plan-o-grams and designs, methods and procedures"). The district court also found that NimbeLink's complaint did not properly allege that Digi used NimbeLink's confidential information to develop its own products because "the Court cannot reasonably infer that Digi breached the NDAs based solely on its development of XBee Cellular modem products" and the "complaint fails to offer another plausible basis for the alleged breach." Appx35-36, *citing Pension Advisory Grp., Ltd. v. Country Life Ins. Co.*, 771 F.Supp.2d 680, 700-01 (S.D. Tex. 2011) (dismissing breach of contract claim because plaintiffs "have not sufficiently alleged the manner in which those contracts were breached").

The district court subsequently denied NimbeLink's motion to amend the complaint on the grounds that its motion was untimely. Appx53 at Dkt. Entry No. 108.

### B. <u>The District Court's Indefiniteness Finding and Judgment of Invalidity of the Claims of the Patents-in-Suit</u>

During claim construction, the parties presented to the district court disputes concerning the construction of four terms. Appx6 at n.3. The district court only addressed one term, "space-efficient cellular modem device," which appears in the preamble of every claim of the Patents-in-Suit.

NimbeLink asked the district court to construe "space-efficient cellular modem device" to mean "a cellular modem device incorporating a multi-layer PCB and with a footprint consistent with the footprint of an XBee form factor." Appx22. Digi did not offer a proposed construction, instead, contending that the term is indefinite. Appx14; Appx16 at n.8.

The district court concluded that the "space-efficient" term was limiting "because it recites additional structure that is underscored as important by the specification." Appx11. The district court then concluded that the term is indefinite because it is amenable to more than one meaning, and the specification does not provide guidance on which meaning is applicable: "It is unclear whether the objective boundary is (1) the efficient spacing of surface-mounted components, connectors, and interfaces or (2) the size of the modem." Appx21. Although the district court acknowledged that the specifications of the Patents-in-Suit provided numerous examples of sizes of the claimed embedded cellular modems, in the written description, drawings, and dependent claims, the district court held that it could not rely on those examples to define the meaning of "space-efficient cellular modem device" because doing so "would improperly import limitations from the specification into the claim …." Appx24-25, *citing Pfizer, Inc. v. Ranbaxy Labs., Ltd.*, 457 F.3d 1284, 1290 (Fed. Cir. 2006).

The district court consequently entered judgment of invalidity of the claims of the Patents-in-Suit. Appx3-4.

## SUMMARY OF THE ARGUMENT

The preamble term "space-efficient cellular modem device" is not indefinite. Contrary to the district court's finding, this term is not amenable to more than one meaning. The Patents-in-Suit—including the written description, the drawings, and the claims—make clear that "space-efficient" refers to the size of the "cellular modem device." Moreover, the Patents-in-Suit and their file histories provide several examples of sizes of cellular modems that fall within the scope "space-efficient cellular modem devices." There is no support for the district court's conclusion that "space-efficient" could also refer to "the efficient spacing of surface-mounted components, connectors, and interfaces" on the PCB of modem. The district court relied on only a single sentence, which did not use the term "space-efficient"; the term that sentence did use, "efficient spacing" of components on the PCB, is not the same as a "space-efficient cellular modem device." Thus, the disclosures of the Patents-in-Suit provide sufficient guidance to persons of skill in the art regarding the meaning of "space-efficient cellular modem device" and the scope of the claims; therefore, the phrase is not indefinite. Accordingly, this Court should reverse the district court's indefiniteness finding and judgment of invalidity and remand for further proceedings.

Based on the disclosures of the Patents-in-Suit, the proper construction of "space-efficient cellular modem device" is "a cellular modem device incorporating a multi-layer PCB and with a footprint consistent with the footprint of an XBee form factor." The specification repeatedly refers to the claimed cellular modems as "XBee-sized" or consistent with "an XBee-form factor." They also disclose examples of sizes of cellular modems that fall within the scope of "space-efficient cellular modem devices," all of which are consistent with the footprint of an XBee form factor. The district court ignored the examples recited by the Patents-in-Suit and rejected NimbeLink's proposed construction on the grounds that adopting that construction "would improperly import limitations from the specification into the claims," but that principle warns against improperly **narrowing** the scope of the claims; it does not dictate that a court must **ignore** examples and embodiments when construing the claims. Accordingly, this Court should construe "space-efficient cellular modem device" to mean "a cellular modem device incorporating a multi-layer PCB and with a footprint consistent with the footprint of an XBee form factor."

Finally, the district court erroneously dismissed NimbeLink's claims asserting that Digi breached the parties' non-disclosure agreements for failure to state a claim. Contrary to the district court's findings, NimbeLink's complaint adequately pled both the nature of the confidential information at issue and that

Digi used NimbeLink's confidential information without authorization for non-permitted uses, including in deciding to develop and launch a competitive embedded cellular modem product and in formulating a market strategy for that product. Accordingly, this Court should reverse the district court's dismissal of NimbeLink's breach of contract claims and remand for further proceedings.

# ARGUMENT

## I. THE DISTRICT COURT ERRED IN FINDING THAT "SPACE-EFFICIENT CELLULAR MODEM DEVICE" IS INDEFINITE

### A. Standard of Review: De Novo

This Court reviews a determination of indefiniteness de novo. *Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1284 (Fed. Cir. 2023). "Determinations about governing legal standards and about intrinsic evidence are reviewed *de novo*, and any factual findings about extrinsic evidence relevant to the question … are reviewed for clear error." *Id.*, *quoting BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).

### B. The Relevant Legal Standards

Indefiniteness is a question of law governed by "the same principles that generally govern claim construction," *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008), and must be proven by clear and convincing evidence. *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017). A claim is indefinite if it "fails to inform those skilled in the art about the scope of the

invention with reasonable certainty" when "viewed in light of the specification and prosecution history." *Nautilus, Inc. v. Biosig Instrs., Inc.*, 572 U.S. 898, 910 (2014).

"Absolute precision" is not required; indeed, due to the "inherent limitations of language," "[s]ome modicum of uncertainty is the price of ensuring the appropriate incentives for innovation." *Nautilus*, 572 U.S. at 909-910 (citation and internal quotations omitted). Thus, "mathematical precision" is not required in order to comply with the definiteness requirement. *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014), *citing Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1384 (Fed. Cir. 2005). *See also Guangdong Alison Hi-Tech Co. v. International Trade Comm'n*, 936 F.3d 1353, 1359 (Fed. Cir. 2019).

The intrinsic evidence can provide the necessary guidance to a person of skill in the art. "Intrinsic evidence—such as the claims, figures, written description, or prosecution history of a patent—can provide the necessary objective boundaries." *Guangdong Alison*, 936 F3d at 1360. In addition to intrinsic evidence, relevant extrinsic evidence "can provide or help identify the necessary objective boundaries for claim scope." *Niazi Lic. Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1349 (Fed. Cir. 2022).

A "claim is indefinite if its language 'might mean several different things and no informed and confident choice is available among the contending

definitions.'" *Media Rts. Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015), quoting *Nautilus*, 572 U.S. at 911, n.8.

### C. **"Space-Efficient Cellular Modem Device" Is Not Indefinite**

The specification and drawings of the Patents-in-Suit provide persons of ordinary skill in the art with a wealth of information and guidance regarding the meaning of "space-efficient cellular modem device" as used by the patentees. The district court's conclusion that "space-efficient" is nevertheless indefinite was based on two conclusions: that "space-efficient" is amenable to more than one meaning, referring to either the spacing of components on the PCB or the size of the modem, and that the specification does not clearly indicate which meaning is intended. The court determined that "[i]t is unclear whether the objective boundary is (1) the efficient spacing of surface-mounted components, connectors, and interfaces or (2) the size of the modem." In rejecting NimbeLink's proposed construction, the district court further determined that, even if "space-efficient" refers to the size of the cellular modem device, the specification does not teach a person of ordinary skill in the art what sizes are covered by the term.

Both conclusions are erroneous. The specification clearly ties "space-efficient" to the size of the cellular modem device. Moreover, the specification provides examples of the sizes of the claimed modems—in the written description,

in the drawings, and in the dependent claims—that provide guidance to persons of ordinary skill regarding the scope of "space-efficient."

### 1. "Space-Efficient" Refers to the Size of the "Cellular Modem Device"

#### a) <u>The Patents-in-Suit Clearly Disclose that "Space-Efficient" Refers to the Size of the "Cellular Modem Device"</u>

The specification clearly discloses that "space-efficient" refers to the size of the cellular modem device. This guidance is sufficient to establish that "space-efficient cellular modem device" is not indefinite. A claim term is not indefinite when examples in the specification provide guidance on the meaning of the term. This Court has held that a term of degree is not indefinite where "the intrinsic evidence provided guidance as to the scope of the claims," including examples. *Sonix Tech.*, 844 F.3d at 1377, *discussing Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1334-1335 (Fed. Cir. 2010).

The intrinsic evidence makes clear to a person of skill that the adjective "space-efficient" refers to the size of the device. The intrinsic evidence both explicitly and implicitly defines "space-efficient" in terms of the size of the claimed device. The patentees make this point clearly and directly when they tout the "space-efficient size" of the invention. *See* Appx102 at 5:3-6. The connection between "space-efficient" and size is also made directly at the very beginning of the specification. In the "Background of the Invention" section, the patentees note

that embedded cellular modems are “generally known,” but that these devices “typically require a large footprint.” Appx100 at 1:28-32. In the very next sentence, the patentees describe the cellular modem of the invention in a way that contrasts with the “large” prior art devices: “Embodiments of the invention comprise various space-efficient, embedded cellular modems for use in M2M applications.” *Id.* at 1:36-38. This disclosure makes clear that “space-efficient” modems embodying the invention do not have the “large footprint” of “presently known modems.”

The patentees reinforce this point again in the next sentence by describing an embodiment in which the components of the embedded modem are fit into an “XBee® form factor”: “In an embodiment, cellular modems of the invention include a cellular transceiver module, U.FL antenna port, power management electronics, level shifter electronics, and 40 an interface, all in an XBee® form factor.” *Id.* at 1:38-41. This point is further reinforced later in the specification, when they refer to “the **compact**, space-efficient embedded cellular modem” of the patents.” *Id.* at 4:19-21 (emphasis added). The patentees’ use of the word “compact” in conjunction with “space-efficient” again emphasizes to persons of skill in the art that “space-efficient” is defined in terms of size.

Beyond these explicit connections between “space-efficient” and size, the specification emphasizes the importance of the small size of the claimed cellular

modem. The small size of the invention is one of its key features. For example, the specification repeatedly refers to the size of the device. Appx102 at 5:9-11 (referring to the "XBee-sized board" of the invention); *id.* at 5:19-21 (same); *id.* at 5:15-18 (noting that multi-layer printed circuit board of the invention "minimizes size" of the device). The patentees emphasized the fact the "space-efficient embedded cellular modem" incorporates all of the components of the modem "in an XBee form factor," *i.e.*, in a small footprint: "Embodiments of the invention comprise various space-efficient, embedded cellular modems …. In an embodiment, cellular modems of the invention include a cellular transceiver module, U.FL antenna port, power management electronics, level shifter electronics, and an interface, **all in an XBee form factor**." Appx100 at 1:36-41 (emphasis added). The district court even acknowledged that the specification suggests that the size of the modem was important to the inventors, Appx19-20, and provides several examples that reference an XBee-sized board. Appx18-19. The only reason the district court held the term to be indefinite **despite** this teaching in the specification is apparently because of the "varied use of the term 'space-efficient.'" Appx20, *citing Interval*, 766 F.3d at 1371.

Even the claims of the Patents-in-Suit support this teaching regarding the scope of "space-efficient." Claims 6 and 16 of the '570 Patent claim a cellular modem device "wherein a length of the … device does not exceed 40 mm and the

width of the … device does not exceed 35 mm," and claims 7 and 17 of the '570 Patent and claims 11, 18, and 27 of the '066 Patent claim a cellular modem device "wherein the length of the … device does not exceed 34 mm and a width of the … device does not exceed 29 mm." Appx102-103, Appx129-130. Dependent claims can provide guidance to persons of ordinary skill in the art regarding the meaning of terms of degree. *Enzo Biochem*, 599 F.3d at 1334 (holding that "not interfering substantially" was not indefinite where, in part, dependent claims in each patent "provide at least some guidance as to how much interference will be tolerated"). *See also Niazi*, 30 F.4th at 1349 ("[n]umerous dependent claims further inform the meaning of this term by providing exemplary resilient materials of which the other catheter could be made"). Here, like in *Enzo Biochem*, the dependent claims provide direct evidence for a person of ordinary skill in the art that cellular modems of at least the dimensions recited in the claims are "space efficient." *Enzo Biochem.*, 599 F.3d at 1334 ("it may be presumed that the term 'not interfering substantially' in the independent claims allows for **at least as much interference** as that exhibited" by the structure recited in the dependent claims (emphasis added)).

The Patent Examiner clearly understood the importance of the size of the device to the invention. In allowing the '570 Patent, the Patent Examiner noted that, although "cellular modems are well known in the prior art," the "prior art

does not disclose the specific circuit structure including the arrangement, **relative size** and overall complete structure of the claimed invention." *See* Appx927 (emphasis added).

The intrinsic evidence is consistent with the ordinary meaning of "efficient." "Efficient" means "productive of desired effects, *especially* capable of producing desired results with little or no waste (as of time or materials)." *See* Appx2027. "Space-efficient cellular modem device," therefore, is a cellular modem that results in little or no waste of space; in other words, a small modem.

Taken together, the intrinsic evidence unequivocally provides "objective boundaries" that teach persons of skill in the art the scope of the claims. This Court has held repeatedly that, where the intrinsic evidence describes examples of embodiments that meet the limitation in question, those examples provide guidance to persons of skill in the art as to the scope of the term and the claim. *See*, *e.g.*, *Niazi*, 30 F.4th at 1349-1350 ("resilient" and "pliable" are not indefinite because specification "**contains numerous examples**" of resilient and pliable materials (emphasis added)); *Guangdong Alison*, 936 F.3d at 1362 ("examples and procedures in the written description provided sufficient guidance and points of comparison to render claim terms not indefinite"); *Sonix*, 844 F.3d at 1379 ("visually negligible" not indefinite based on "examples of visually-negligible indicators"). Like the patent in *Sonix*, the Patents-in-Suit here provide substantial

guidance on the meaning of "space efficient," including examples of cellular modems of a size consistent that satisfy the "space efficient" requirement.

This case is on all fours with this Court's decision in *Niazi*. In that case, the district court had held that two terms of degree in the claims directed to a catheter—"resilient" and "pliable"—rendered the claims in which they appeared indefinite. *Niazi*, 30 F.4th at 1344. This Court, however, found that the intrinsic evidence provided substantial guidance to persons of skill in the art regarding the meanings of "resilient" and "pliable." The Court determined that the claims themselves provided guidance, including dependent claims that provided examples of materials that could be used. *Id.* at 1349. Additionally, the specification provided guidance by describing the catheter and its relevant characteristics, as well as by naming exemplary materials that could be used to make a resilient, pliable catheter. *Id.* Based on this evidence, this Court found that the intrinsic record was "sufficient to dispose of" the indefiniteness issues. *Id*. The same is true in this case. Here, the claims themselves provide guidance on the scope of "space-efficient," including dependent claims that provide examples of the dimensions of cellular modems that are "space-efficient." Similarly, the specification and the drawings provide guidance on the meaning of "space-efficient" by again providing the dimensions of exemplary cellular modems that are "space-efficient," as well as by disclosing that the space-efficient cellular modems of the invention are "XBee-

sized." The file history provides guidance as well; materials provided as part of the provisional patent application, to which both patents claim priority, identify the covered product as having an "XBee form factor" and show the dimensions that satisfy the "space-efficient" requirement. Just as in *Niazi*, the intrinsic record in this case is "sufficient to dispose of" the indefiniteness issues that Digi raises. *See also Biosig Insts., Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1382-1384 (Fed. Cir. 2015) ("spaced relationship" not indefinite where claim and intrinsic evidence provided guidance to a person of skill in the art).

b) The District Court Erroneously Concluded that "Space-Efficient" Could Refer to "the Efficient Spacing of Surface-Mounted Components, Connectors, and Interfaces."

As set forth above, the district court's determination that "space-efficient cellular modem device" is indefinite was based primarily on its conclusion that "space-efficient" could refer to either the size of the cellular modem device or "the efficient spacing of surface-mounted components, connectors, and interfaces." As this Court has explained, indefiniteness of a claim term cannot be established "by 'merely identify[ing] different ways one could interpret'" the term. *Neonode Smartphone LLC v. Samsung Electronics Co., Ltd.*, No. 2023-2304, 2024 WL 3873566, at *4 (Fed. Cir. Aug. 20, 2024), *quoting ClearOne, Inc. v. Shure Acquistion Holdings, Inc.*, 35 F.4th 1345, 1351 (Fed. Cir. 2022). "Such a test would render nearly every claim indefinite so long as a party could manufacture a

plausible construction." *Id.*, *quoting Nevro Corp. v. Boston Sci. Corp.*, 955 F.3d 35, 41 (Fed. Cir. 2020).

Here, the district court's alternative meaning—that "space-efficient cellular modem device" could refer to "the efficient spacing of surface-mounted components, connectors, and interfaces"—is not plausible. In support of its conclusion, the district court relied on a passage that does not use the term "space-efficient" and does not refer to the nature of the "cellular modem device" recited in the preamble. The district court noted that the specification teaches, "in reference to Figure 6," that the multi-layer embodiment **of the PCB**—**not** the cellular modem device—"allows for efficient spacing of surface-mounted components, connectors, and interfaces for the XBee form factor." Appx17, *quoting* Appx101 at 4:31-33.

This finding is unsupported. "Space-efficient" and "efficient spacing" are not the same thing. "Efficient spacing" provides no guidance on the meaning of "space-efficient cellular modem device." In any event, Figure 6, and the passage cited by the district court, are directed to the PCB, not to the "cellular modem device" that the preamble describes as "space-efficient."

The district court also concluded that the specification suggests "a connection between 'space-efficient' and surface mount connectors." Appx17, *quoting* Appx102 at 5:3-6 (the "space-efficient size of embedded cellular modem

100 is enabled by the use of surface mount connectors to meet XBee pinout requirements while freeing up surface area”). This does not support the district court’s conclusion that “space-efficient cellular modem device” could refer to “the efficient spacing of surface-mounted components, connectors, and interfaces.” In fact, this passage unequivocally indicates that “space-efficient” refers to the **size of the cellular modem device**. The only “connection” to “surface mount connectors” is the indication that such connectors may assist in making the “space-efficient size of [the] embedded cellular modem” possible.

#### 2. The Patents-in-Suit Provide Sufficient Guidance to a Person of Skill in the Art Regarding the Meaning of “Space-Efficient”

Having established that the specification defines “space-efficient” in terms of the size of the claimed cellular modem device, it remains to be determined whether the intrinsic evidence provides sufficient guidance to those skilled in the art about the scope of the invention. Here, too, it is clear that the Patents-in-Suit sufficiently define the scope of “space-efficient” and, therefore, the scope of the claims. The claims, the specification, the drawings, and the prosecution history **all** provide guidance to persons skilled in the art regarding the “objective boundaries” of “space-efficient.”

Because the term "space-efficient cellular modem device" is not indefinite, this Court should reverse the district court's indefiniteness finding and judgment of invalidity and remand for further proceedings.

### D. **<u>If "Space-Efficient Cellular Modem Device" Were Indefinite, It Would Not be Limiting</u>**

Construed to mean "a cellular modem device incorporating a multi-layer PCB and with a footprint consistent with the footprint of an XBee form factor," the "space-efficient cellular modem device" of the preamble to the claims is limiting. Appx743-744 at ¶ 14. On the other hand, if the phrase is indefinite—*i.e.*, if it has no meaning—it simply cannot breathe "live, meaning, and vitality" into the claims. Therefore, if this Court determines that the "space-efficient cellular modem device" term is indefinite, then that term is simply not a claim limitation. *Id.*

"Space-efficient" is only limiting in this case because it is "necessary to give life, meaning, and vitality to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). The body of the claims describe a complete invention in the absence of the phrase "space-efficient;" therefore, "space-efficient" does not "recite essential structure." *Id.* Further, NimbeLink did not rely on "space-efficient" to distinguish cited prior art during prosecution of the Patents-in-Suit. Finally, "space-efficient cellular modem device" does not provide antecedent basis for any terms in the bodies of the claims. Under these circumstances, it is not mandated that the preamble be limiting. *See*

*American Med. Systs., Inc. v. Biolitic, Inc.*, 618 F.3d 1354, 1359 (Fed. Cir. 2010) (holding that "'photoselective vaporization of tissue' does not provide a necessary antecedent basis for the term 'the tissue' in the bodies of each of the independent claims"); *Arctic Cat Inc. v. Polaris Indus. Inc.*, No.16-cv-0010 (WMW/HB), 2017 WL 11679225 at *4 (D. Minn. Dec. 20, 2017) ("**multi-purpose** vehicle" in preamble not limiting even though it provided antecedent basis for "vehicle" in the body of the claims).

However, "space-efficient modem" is limiting in this case because it gives "life, meaning, and vitality" to the claim. If "space-efficient modem" were indefinite, however, it plainly could not give life, meaning, or vitality to the claims, and would therefore not be limiting. *See*, *e.g.*, *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346-47 (Fed. Cir. 2002) ("fast steering" in preamble could not be understood by persons of skill in the art, and therefore did not give life, meaning and vitality to the claimed structure; term was therefore not limiting); *SFA Systs., LLC v. 1-800-Flowers.com, Inc.*, 940 F.Supp.2d 433, 456-457 (E.D. Tex. 2013) (where defendant argues that term in preamble is indefinite, then "[b]y Defendants' own arguments" the term "cannot be necessary to give meaning to the claim" and is not limiting). Accordingly, if "space- efficient cellular modem device" were indefinite, this Court should hold that this preamble term is not limiting.

## II. THE DISTRICT COURT ERRED IN REFUSING TO CONSTRUE "SPACE-EFFICIENT CELLULAR MODEM DEVICE" TO MEAN "A CELLULAR MODEM DEVICE INCORPORATING A MULTI-LAYER PCB AND WITH A FOOTPRINT CONSISTENT WITH THE FOOTPRINT OF AN XBEE FORM FACTOR"

### A. Standard of Review: De Novo

"The ultimate construction of claim language is a question of law reviewed de novo, based upon underlying factual determinations reviewed for clear error." *SimpleAir, Inc. v. Sony Ericsson Mobile Comms. AB*, 820 F.3d 419, 425 (Fed. Cir. 2016), citing *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318 (2015). The meaning of a claim term "in light of its use in the claims, the disclosure in the specification, and the discussion of the term in the prosecution history is a question of law." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1342 (Fed. Cir. 2015).

### B. The Relevant Legal Standards

The basic legal principles governing claim construction are well established. The scope of the claim is evaluated in view of the intrinsic evidence: the claim, the patent specification, and the prosecution history of the patent. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Indeed, the specification is usually "dispositive; it is the single best guide to the meaning of a disputed term." *Id.*

The words in a claim are presumed to have their ordinary meaning, which is the meaning that the term would have had to a person of ordinary skill in the art at the time of invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). The ordinary meaning controls unless the patentee otherwise explicitly defines the claim term or unless the term chosen by the patentee is ambiguous. *Thorner v. Sony Comp. Ent. Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012) (claim term is entitled to "the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope"). *See also Teleflex, Inc. v. Ficosa North Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002); *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999). The patentee may choose to be his or her own lexicographer and use terms in a manner other than their ordinary meanings. *Vitronics*, 90 F.3d at 1582. The "heavy presumption" in favor of the claim term's ordinary meaning may be overcome, though, only if a different meaning is "clearly and deliberately set forth in the intrinsic evidence." *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Corp.*, 308 F.3d 1167, 1177 (Fed. Cir. 2002).

Ordinarily, the Court may not consider extrinsic evidence—all evidence other than the patent claims, specification, and prosecution history—unless the term is ambiguous. *Mantech Envtl. Corp. v. Hudson Envtl. Serv., Inc.*, 152 F.3d 1368, 1373 (Fed. Cir. 1998); *Vitronics*, 90 F.3d at 1584. However, in the case of

technical claim terms, the Court may consider extrinsic evidence such as expert testimony after first considering the intrinsic evidence. *Optical Disc. Corp. v. Del Mar Avionics*, 208 F.3d 1324, 1334 (Fed. Cir. 2000). "Although the patent file may often be sufficient to permit the judge to interpret the technical aspects of the patent properly, consultation of extrinsic evidence is particularly appropriate to ensure that his or her understanding of the technical aspects of the patent is not entirely at odds with the understanding of one skilled in the art." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999).

### C. The Proper Construction of "Space-Efficient Cellular Modem Device" Is "a Cellular Modem Device Incorporating a Multi-Layer PCB and With a Footprint Consistent With the Footprint of an XBee Form Factor"

The proper construction of "space-efficient cellular modem device" is a cellular modem device "with a footprint consistent with the footprint of an XBee form factor." The district court's rejection of this construction was erroneous.

The specifications of the Patents-In-Suit make clear that, when the claims refer to a "space-efficient cellular modem device," they refer to a cellular modem device that has a footprint consistent with the footprint of an XBee form factor. In other words, the specification uses XBee form factors as a guide to determine whether a particular cellular modem device is "space-efficient." Appx741-742 at ¶ 10.

A ”form factor” is a set of physical characteristics, such as size, shape, and other physical specifications, that define an electronic device. “XBee form factor” refers to a family of wireless connectivity devices that share a few “form factors.” Appx740-741 at ¶ 9. XBee form factors refer to a family of wireless connectivity devices that share common characteristics and features. Appx740-742 at ¶¶ 9-10. Examples of XBee form factors can be seen in mechanical drawings of devices that are XBee form factor compatible, such as Skywire™:




Appx649 (Skywire™ mechanical drawing from ‘651 Provisional Application). *See also* Appx738 (mechanical drawings of devices compatible with XBee form factor); Appx740-741 at ¶ 9. XBee form factors have been widely adopted by device manufacturers for various applications. The XBee® brand name itself is a registered trademark of Digi; although anyone can make devices that are

compatible with an XBee form factor, only Digi can market devices using the brand name "XBee®."

The intrinsic evidence makes clear that the XBee form factors are the standard for determining whether a cellular modem device is "space-efficient." Appx741-742 at ¶ 10. The specifications of the Patents-in-Suit note that prior art embedded cellular modems "require a large footprint." Appx100 at 1:28-32. In contrast, the cellular modem devices of the Patents-in-Suit have a footprint consistent with the footprint of an XBee form factor, as the specifications make clear to a person of ordinary skill in the art. Appx741-742 at ¶ 10. The specifications explain that:

> [e]mbodiments of the invention comprise various space-efficient, embedded cellular modems for use in M2M [machine-to-machine] applications. In an embodiment, cellular modems of the invention include a cellular transceiver module, U.FL antenna port, power management electronics, level shifter electronics, and an interface, all in an XBee form factor.

Appx100 at 1:36-41. *See also* Appx102 at 5:3-12 (referring to the "XBee-sized board" of the claimed embedded cellular modem); Appx102 at 5:19-21 (referring to the "XBee- sized board" of the claimed invention).

The specification of the Patents-in-Suit repeatedly makes clear that the claimed cellular modem is consistent in size with an XBee form factor. It repeatedly describes the invention as "XBee sized," explicitly tying the size of the

claimed cellular modem to the known sizes of the circuit board used in the XBee form factor devices. *See* Appx102 at 5:9-11 ("the use of a micro-SIM card slot on an XBee-sized board provides unique advantages over known modems"); *id.* at 5:19-21 ("GPS and GLONASS positioning support in an XBee-sized board is also unique"). The specification also teaches that the claimed cellular modem can conform to an XBee form factor. *See* Appx101 at 4:19-28; 5:19-21. The claims reinforce this teaching: two dependent claims in the '570 Patent recite a cellular modem device that "conforms to an XBee form factor." *See* 'Appx102-103 at claims 5 and 15. The dimensions disclosed in the specification and the claims confirm this: they are consistent with the footprint of an XBee form factor. Appx741-742 at ¶ 10; *compare* Appx101 at 4:16-17 ("In an embodiment, PC board 116 defines an envelope dimension of 33.60 mm x 29.00 mm.") to Appx648-649 (showing dimensions for NimbeLink Skywire™ Embedded Cellular Modem with "XBee Form Factor" as 33.6 mm by 29 mm) and Appx738 (showing Digi XBee® RF [non-cellular] modems with dimensions of 32.94 mm by 24.38 mm and 27.61 mm by 24.38 mm).

A person of skill in the art would also conclude that consistency with the footprint of an XBee form factor is the standard for determining whether a cellular modem device is "space-efficient" based on the '651 Provisional Application. In disclosing their innovative, "space-efficient" cellular modem to the Patent Office

in their provisional patent application, the patentees consistently and repeatedly referred to XBee form factors. *See*, *e.g.*, Appx619, Appx622, Appx624, Appx627, Appx648, Appx652, and Appx689. The Patent Application includes mechanical drawings showing the footprint of the XBee-form- factor-compatible Skywire™ product. Appx649, Appx675, and Appx682. The patentees' repeated references to the XBee form factor and inclusion of the mechanical drawings of the Skywire™ product further informs a person of skill in the art that "space- efficient" refers to the footprint of XBee form factors.

Persons of skill in the art would be familiar with XBee form factors and would understand that an "XBee-sized" device, or a device that "conforms to an XBee form factor," would have a size consistent with these known dimensions, or footprints, of XBee devices. Thus, through its descriptions of the invention as "XBee-sized" or consistent with an "XBee form factor," the Patents-in-Suit teach persons of skill in the art a range of sizes for the "space-efficient cellular modem device" of the claims. Not only does the intrinsic evidence implicitly teach persons of skill in the art a range of sizes of the claimed cellular modem through their references to "XBee-sized devices" and "XBee form factors," the intrinsic evidence explicitly teaches persons of skill in the art a range of sizes for the claimed devices. As noted above, the specification discloses embodiments with dimensions of 33.6 mm x 29 mm. Figures 5, 8, and 10 of the Patents-in-Suit depict

embodiments with the same 33.60 mm x 29.0 mm dimensions. Appx83 and Appx85-86. The Appendices to the provisional application—which disclose embodiments of the claimed cellular modem—describe and depict modems with these same dimensions. Appx648-649 (showing dimensions for NimbeLink Skywire™ Embedded Cellular Modem with "XBee Form Factor" as 33.6 mm by 29 mm).

It does not matter that XBee does not have a single "standard size or shape." Appx23. The evidence, including Digi's own documents, demonstrates that the XBee form factors do have standard sizes. *See* Appx741-742 at ¶ 10 (citing evidence showing dimensions for XBee form factor products of 33.6 mm x 29 mm for the NimbeLink Skywire product with "XBee Form Factor"; 32.94 mm by 24.38 mm for XBee Pro products; and 27.61 mm x 24.38 mm for XBee products). There is more than one XBee form factor, and therefore more than one footprint, or size, associated with an XBee form factor. Appx2068 at 95:19-25 (there are a few different XBee form factors, "meaning a few different sizes, shapes, pinouts that are called XBee"); Appx2069 at 99:22-4. Digi's own documents refer to both "XBee" and "XBee-Pro" products, each of which have specific, precise, dimensions. Appx736-738. That is why the patent repeatedly refers to "**an** XBee form factor," rather than "**the** XBee form factor," and why NimbeLink's

construction refers to "**a** footprint of **an** XBee form factor," rather than "**the** footprint of **the** XBee form factor."[2]

The specifications of the Patents-in-Suit also make clear that a "space-efficient cellular modem device" means a cellular modem device that incorporates a multi-layer PCB. Appx742 at ¶ 11; Appx101 at 4:19-21 ("the compact, space-efficient embedded cellular modem 100 achieves the XBee form factor by utilizing a multi- layer PC board."); Appx101 at 4:31-33 (multi-layer circuit board allows all components within XBee form factor); Appx102 at 5:15-18 (the "multi-layer stackup approach … minimizes size"). A person of ordinary skill in the art would therefore understand that "space-efficient," as used in the Patents-in-Suit, means also that the device incorporates a multi-layer PCB to achieve a footprint consistent with a footprint of an XBee form factor. Appx742 at ¶ 11.

[2] Claim terms are given "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312-13. Thus, "space-efficient cellular modem device" refers to cellular modems with a footprint consistent with a footprint of an XBee form factor in existence as of February 6, 2014, the filing date of NimbeLink's provisional patent application. These would include all of the form factors disclosed in Digi's documents, Appx741-742 at ¶ 10, including the XBee form factor of NimbeLink's patented Skywire product, which was disclosed in the provisional patent application, and the Digi XBee and XBee-Pro form factors. Appx738.

## D. <u>The District Court Incorrectly Rejected NimbeLink's Proposed Construction</u>

### 1. The District Court Improperly Ignored the Teachings of the Specification Regarding the Meaning of "Space-Efficient Cellular Modem Device"

The district court ignored the clear guidance in the specification regarding the dimensions that fall within the meaning of "space-efficient" on the grounds that it "would improperly import limitations from the specification into the claim …." Appx24-25, *citing Pfizer*, 457 F.3d at 1290. But that claim construction principle has no application here. "Space-efficient cellular modem device" must be interpreted in light of the specification. *Phillips*, 415 F.3d at 1315. The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. Here, the specification teaches persons of skill in the art that a "space-efficient cellular modem device" is one that has a footprint consistent with the footprint of an XBee form factor, as set forth above. Thus, NimbeLink's construction **is** the "ordinary meaning that [space-efficient cellular modem device] would have to a person of ordinary skill in the field of the invention … read in view of the specification …." *Gillespie v. Dywidag Systs. Int'l, USA*, 501 F.3d 1285, 1291 (Fed. Cir. 2007), *citing Phillips*, 415 F.3d at 1312 and 1315. NimbeLink's construction, therefore, does not depart from the plain and ordinary meaning of the claim terms."

In any event, the district court's concern about importing limitations into the claims cannot justify ignoring the examples in the specification for purposes of evaluating indefiniteness. This canon of claim construction warns against improperly *narrowing* the scope of the claim based on examples in the specification. It certainly does not sanction *ignoring* examples that provide guidance on the meaning of claim terms.

### 2. It Is Irrelevant that the Patents Do Not Use the Phrase "Footprint of an XBee Form Factor"

The district court also rejected NimbeLink's proposed construction in part on the grounds that the "[f]ootprint of an XBee form factor" is not mentioned anywhere in the Asserted Patents." Appx23. The district court further indicated that "neither the embodiments nor the dependent claims tie back to 'the footprint of an XBee form factor.'" Appx25.

Though the specification may not use the phrase "footprint of an XBee form factor," it does use the term "footprint" when describing the differences between the claimed cellular modems and the prior art. *See* Appx100 at 1:28-32 (known cellular modems "require a large footprint"). The specification uses "footprint" in the same way NimbeLink uses the word in its proposed construction: to refer to the size of the device. Appx2070 at 113:14-18; Appx2074 at 117:16-21. This is consistent with the ordinary meaning of the word "footprint." The dictionary definition of "footprint" is "the area on a surface covered by something." *See*, *e.g.*,

Appx2005. Thus, the "footprint" of an embedded cellular modem is the area it covers on surface of the machine in which it is embedded, *i.e.*, its size. Digi's expert agrees that the Patents-in-Suit use "footprint" to mean the size of the device. Appx2013 at 34:4-6 ("Q. So large footprint there refers to the size of those presently used modems, correct? A. In that context, I would agree.").

As demonstrated above, the specification repeatedly discusses and refers to the size of claimed cellular modem, even if it does not use the phrase "footprint of an XBee form factor" to identify the size. The specification's reference to an "XBee-sized" device has the same meaning as "the footprint of an XBee form factor." Thus, there is no merit to the district court's concern that there are no "objective boundaries for 'the footprint of an XBee form factor.'" Appx25.

### 3. The File History Does Not Justify the District Court's Rejection of NimbeLink's Proposed Construction

Finally, the district court rejected NimbeLink's construction on the grounds that NimbeLink removed the phrase "packaged in an XBee form factor" from the independent claims when it filed its nonprovisional application. Appx25-26. According to the district court, this shows that the patentees decided not to limit the independent claims with reference to an XBee form factor. Appx26.

This conclusion depends on a false equation between "the **footprint** of an XBee form factor" and "the XBee form factor." NimbeLink does not seek to add "packaged in an XBee form factor" to its construction or to the claims.

NimbeLink's construction requires that the "space-efficient cellular modem device" have a **footprint** that is consistent with the **footprint** of an XBee form factor. That is not the same as a requirement that the device be "packaged in an XBee form factor," which would require other significant features, including a specific pin architecture. *See*, *e.g.*, Appx740-741 at ¶ 9. Accordingly, NimbeLink's construction is not inconsistent with the prosecution history of the Patents-in-Suit.

## III. THE DISTRICT COURT ERRED IN DISMISSING NIMBELINK'S BREACH OF CONTRACT CLAIMS FOR FAILURE TO STATE A CLAIM FOR RELIEF

### A. Standard of Review: De Novo

This Court reviews grants of motions to dismiss according to the law of the respective regional circuit, in this case the Eighth Circuit. *Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256, 1259 (Fed. Cir. 2018), *citing Cleveland Clinic Found. v. True Health Diags. LLC*, 859 F.3d 1352, 1359 (Fed. Cir. 2017). The Eighth Circuit reviews the grant of a motion to dismiss de novo, taking the facts alleged in the complaint as true. *Affordable Communities of Mo. v. Federal Nat'l Mortg. Ass'n*, 714 F.3d 1069, 1073 (8th Cir. 2013), *citing Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010).

### B. The Relevant Legal Standards

Pursuant to Fed. R. Civ. P. 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," which only requires allegation of "enough facts to state a claim to relief that is plausible

on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When reviewing a motion to dismiss under Rule 12(b)(6), the Court must "accept all facts pled by the nonmoving party as true and draw all reasonable inferences from the facts in favor of the nonmovant." *Waldron v. Boeing Co.*, 388 F.3d. 591, 592 (8th Cir. 2004). *See also Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014).

To survive a motion to dismiss under Rule 12(b)(6), the "complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Horras v. American Cap. Strategies, Ltd.*, 729 F.3d 798, 801 (8th Cir. 2013), *quoting Twombly*, 550 U.S. at 570. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Factual allegations must be enough to raise a right to relief above the speculative level …." *Twombly*, 550 U.S. at 555.

To state a claim for breach of contract, a plaintiff must show "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014). *See also  Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011).

### C. The District Court Erred When it Dismissed NimbeLink's Breach of Contract Claims for Failure to State a Claim

NimbeLink's complaint sufficiently alleges claims that Digi breached two contracts between the parties: the 2015 NDA and the 2016 NDA. NimbeLink's complaint alleged each of the elements of a breach of contract claim under Minnesota law: (1) formation of the contract; (2) NimbeLink's performance of any conditions precedent; and (3) Digi's breach of the NDAs by using NimbeLink's confidential information for prohibited purposes. NimbeLink's factual allegations comply with Rule 8 and put Digi on notice regarding what NimbeLink's breach of contract claims are and the grounds upon which they are based. That is sufficient under the law.

The only element of NimbeLink's claims for breach of contract at issue on the motion to dismiss was Digi's breach. Appx33 ("Digi argues that the complaint fails to allege facts giving rise to plausible claims that Digi breached the NDAs"). The district court granted Digi's motion to dismiss because it found that NimbeLink's complaint: (1) did not adequately plead the nature of the confidential information that Digi used; and (2) did not adequately plead that Digi used NimbeLink's confidential information in breach of the NDAs.

The district court imposed a heightened pleading standard when it dismissed NimbeLink's breach of contract claims. The district court dismissed NimbeLink's claims in part on the grounds that NimbeLink did not adequately plead the nature

of the confidential information at issue. But NimbeLink's complaint did describe the nature of the confidential information at issue. There is no requirement in the law that NimbeLink disclose the confidential information at issue in its complaint.

The district court also dismissed NimbeLink's claims on the grounds that NimbeLink's allegations did not explain how Digi used NimbeLink's confidential information in breach of the contacts. But NimbeLink did plead allegations explaining how Digi had used its confidential information in contravention of the parties' NDAs. NimbeLink was not required to plead "specific facts" explaining precisely how Digi's conduct is unlawful, or foreclose every possible defense that may be raised by Digi.

#### 1. NimbeLink's Complaint Adequately Pled the Nature of the Confidential Information at Issue

To state a claim for breach of the NDAs, NimbeLink was not required to disclose in its complaint the confidential information that it alleges that Digi used in contravention of those agreements. Instead, NimbeLink need only plead enough facts to establish the nature of the confidential information at issue. "When the breach of contract involves misuse of confidential information, the confidential information need not be enumerated exactly; rather, it is enough to plead facts that establish the ***nature*** of the confidential information." *Sleep Number Corp. v. Young*, 507 F.Supp.3d 1081, 1093 (D.Minn. 2020) (emphasis added). *See also* cases cited therein. Factual allegations identifying the ***type***, ***nature***, or ***category*** of

confidential information are sufficient to put defendant on notice. *Sleep Number*, 507 F.Supp.3d at 1093-1094.

Here, NimbeLink's allegations met this standard, clearly identifying the nature of the confidential information that it provided to Digi and that NimbeLink contends that Digi used in breach of the NDAs to develop and launch its own competing cellular modem products. The district court's conclusion that NimbeLink's complaint "alleges only generally that Digi used 'financial and marketing information' provided by NimbeLink" and "does not offer any factual allegations suggesting the nature of the confidential information Digi allegedly used" is simply incorrect. Appx34. NimbeLink's complaint set forth detailed factual allegations that described the nature of the confidential information at issue.

For example, NimbeLink's complaint alleges that, after the parties signed the 2015 NDA, Digi requested, and NimbeLink provided to Digi, information regarding "the Skywire™ product, NimbeLink's certification process, the market for the Skywire™ product, and NimbeLink's understanding of the market opportunities and basic business strategies." Appx135 at ¶¶ 18-19. In two face-to-face meetings during this period, NimbeLink provided to Digi, at Digi's request and pursuant to the 2015 NDA, "technical information regarding" the Skywire product and "detailed business and market strategy information that underlies the success of the Skywire™ product." *Id.* at ¶ 19. Subsequently, after the parties

entered into the 2016 NDA, NimbeLink provided to Digi, again at Digi's request, "financial and market information …, including detailed financial information about the Skywire$^{TM}$ product and information about the market for that product." Appx136 at ¶ 22.

Thus, the Complaint alleges that the confidential information at issue in this case includes:

- Technical information regarding NimbeLink's Skywire product;
- Information regarding the process NimbeLink used to certify the cellular modems with cellular service providers such as Verizon and T-Mobile;
- Information regarding the market for the Skywire product;
- Information regarding NimbeLink's understanding of the market opportunities for the Skywire product;
- Information regarding basic business strategies relating to the Skywire product;
- Detailed business and market strategy information regarding the Skywire product; and
- Detailed financial information regarding the Skywire product.

NimbeLink's complaint provided far more than general allegations that Digi used "financial and marketing information." The categories described above compare favorably to those successfully pled by the plaintiff in the *Dorset Industries* case cited by the district court: "checkout counter programs and its business model, plan-o-grams and designs, methods and procedures." Appx34-35,

*quoting Dorset Indus.*, 893 F.Supp.2d at 411-412. NimbeLink's allegations certainly satisfy the test set forth in the unpublished District of Minnesota case cited by the district court, which requires that, "at a minimum, a plaintiff 'must plead facts identifying the type of … confidential information'" at issue. Appx34-35, *quoting Schlief*, 2011 WL 1560672, at *4. NimbeLink's allegations unequivocally satisfy the requirements of pleading a breach of contract claim in the Eighth Circuit.

#### 2. NimbeLink's Complaint Adequately Pled Digi's Unauthorized Use of NimbeLink's Confidential Information to Develop and Launch Its Own Competitive Cellular Modem Product

Contrary to the district court's findings, NimbeLink's complaint also adequately pled that Digi used NimbeLink's confidential information in breach of the parties' NDAs to develop and launch its own competitive cellular modem products. The complaint sets forth detailed allegations that Digi used NimbeLink's confidential information to develop its own competing products and to position them in the marketplace. For example, the complaint alleges that, "[d]uring the term of the 2015 NDA, **Digi used NimbeLink's Proprietary Information for non-permitted uses**, including for the purposes of **developing its own cellular modem products and entering the market with those products**." Appx137 at ¶ 27 (emphasis added). The complaint alleged that these "non-permitted uses of NimbeLink's Proprietary Information constitute a breach of the 2015 NDA."

Appx137 at ¶ 28. The Complaint continues by alleging that, "[d]uring the term of the 2016 NDA, Digi used NimbeLink's confidential information for non-permitted uses, including for the purposes of developing its own cellular modem products and entering the market with those products." Appx137 at ¶ 33. These "non-permitted uses," too, "constitute a breach of the 2016 NDA." Appx137 at ¶ 34. In a comprehensive allegation regarding Digi's unauthorized use of NimbeLink's confidential information, NimbeLink alleged that:

> In deciding to develop, manufacture, and sell the Accused Products, and in formulating its marketing strategies for the Accused Products, Digi used, without authorization, the confidential information that NimbeLink had provided to Digi pursuant to the 2015 NDA and the 2016 NA. These unauthorized uses of NimbeLink's confidential information constituted breaches of the 2015 NDA and the 2016 NDA.

Appx138 at ¶ 37.

These allegations are far more than "bare-bones allegations," Appx34, and are sufficient to state a claim for relief in the Eighth Circuit. "Under the Federal Rules of Civil Procedure, 'a court may dismiss a complaint only if it is clear that *no* relief could be granted under *any* set of facts that could be proved consistent with the allegations.'" *Dingxi Longhai Diary, Ltd. v. Becwood Tech. Grp. L.L.C.*, 635 F.3d 1106, 1109 (8th Cir. 2011) (emphasis in original), *quoting Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002). *Cf. Amarin Pharma, Inc. v. Hikma Pharms. USA Inc.*, 104 F.4th 1370, 1376 (Fed. Cir. 2024) (Court of Appeals "may

affirm only if it is certain no relief could be granted under any set of facts that could be proven"), *quoting Warden v. McLelland*, 288 F.3d 105, 110 (3d Cir. 2002). Accepted as true as they must be, NimbeLink's allegations that Digi used NimbeLink's confidential information to develop, manufacture, and sell its competing products, and to formulate its marketing strategies for those products, clearly state a claim for breach of the NDAs.

The district court hypothesized that Digi may have independently developed its products and introduced them to the marketplace, which would not be prohibited by the NDAs. Appx35-36. But the fact that Digi may have a defense to NimbeLink's breach of contract claims has no bearing on whether NimbeLink adequately pled that Digi used NimbeLink's confidential information without authorization. There is no pleading requirement that NimbeLink foreclose every possible defense the defendant may assert, nor is there a pleading requirement that NimbeLink provide evidence with its complaint or prove its claims at the pleading stage.

The district court stated that the "operative complaint fails to offer another plausible basis for the alleged breach." Appx35-36, *citing Pension Advisory Grp.*, 771 F.Supp.2d at 700-701 (dismissing breach of contract claim because plaintiffs "have not sufficiently alleged the manner in which those contracts were breached"). But "no obvious alternative explanation" is not an element of a breach

of contract claim. Rule 8 does not "require a plaintiff to plead 'specific facts' explaining precisely how the defendant's conduct was unlawful." *Zimmer Spine, Inc. v. Wainwright*, Civ. No. 10-cv-4725 (JNE/JSM), 2011 WL 3035133, at *3 (D.Minn. July 7, 2011) (quoting *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). Simply put, "'[p]lausibility does not imply that the district court should decide whose version to believe, or which version is more likely than not.'" *United States v. Black Hills Tree Farm*, No. CIV. 09-5049-JLV, 2011 WL 1044376, at *2 (D.S.D. Mar. 17, 2011) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)). That is exactly what the district court did.

## **CONCLUSION AND RELIEF SOUGHT**

For the reasons stated herein, NimbeLink Corp. respectfully requests this Court reverse the District Courts's finding that "space-efficient cellular modem device" is indefinite and remand for further proceedings. NimbeLink also requests that the Court construe that term to mean "a cellular modem device incorporating a multi-layer PCB and with a footprint consistent with the footprint of an XBee form factor." Finally, NimbeLink respectfully requests that the Court reverse the district court's dismissal of NimbeLink's breach of contract claims and remand those claims to the district court for further proceedings.

Respectfully submitted,

*/s/Devan V. Padmanabhan*
Devan V. Padmanabhan
Paul J. Robbennolt
Erin O. Dungan
Mariah L. Reynolds
Britta S. Loftus
PADMANABHAN & DAWSON PLLC
9800 Shelard Parkway, Suite 120
Minneapolis, MN 55441
(612) 444-3601
devan@paddalawgroup.com
paul@paddalawgroup.com
erin@paddalawgroup.com
mariah@paddalawgroup.com
britta@paddalawgroup.com

*Counsel for Plaintiff-Appellant*

# ADDENDUM

# UNITED STATES DISTRICT COURT

## District of Minnesota

NimbeLink Corp.,

Plaintiff/Counter Defendant,

v.

Digi International Inc.,

Defendant/Counter Claimant.

**JUDGMENT IN A CIVIL CASE**

Case Number: 22-cv-2345 NEB/DJF

☐ **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court**. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED THAT:

The Court dismissed the two remaining inequitable-conduct counterclaims without prejudice on July 15, 2024. (ECF No. 278; *see* ECF No. 282 (Hr'g Tr.) at 54, 55, 59.)

Date: 8/29/2024

KATE M. FOGARTY, CLERK

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

**Warren E. Burger Federal Building and U.S. Courthouse**
316 North Robert Street
Room 100
St. Paul, MN 55101

**Diana E. Murphy U.S. Courthouse**
300 South Fourth Street
Room 202
Minneapolis, MN 55415

**Gerald W. Heaney Federal Building and U.S. Courthouse and Customhouse**
515 West First Street
Duluth, MN 55802

**Edward J. Devitt U.S. Courthouse and Federal Building**
118 South Mill Street
Fergus Falls, MN 56537

## CIVIL NOTICE

**The appeal filing fee is $605.00. If you are indigent, you can apply for leave to proceed in forma pauperis, ("IFP").**

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals or the Federal Circuit Court of Appeals (when applicable) from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or
2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or
3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or
4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| NIMBELINK CORP.,<br><br>Plaintiff,<br><br>v.<br><br>DIGI INTERNATIONAL INC.,<br><br>Defendant. | Case No. 22-CV-2345 (NEB/DJF)<br><br>JUDGMENT OF INVALIDITY OF U.S. PATENT NOS. 9,497,570 AND 9,838,066 |

This matter is before the Court on the parties' Stipulation as to Judgment of Invalidity of U.S. Patent Nos. 9,497,570 and 9,838,066 (together, "Asserted Patents"). (ECF No. 245.) On March 14, 2024, the Court issued a Claim Construction Order construing the term "a space-efficient cellular modem device," which is found in the preamble of all asserted claims of the Asserted Patents, as both limiting and indefinite. (ECF No. 239.) The Court's construction of this term rendered all asserted claims of the Asserted Patents invalid under 35 U.S.C. Section 112(b). (*Id.* at 23.)

On March 20, the parties filed a stipulation agreeing that the Court's construction of the "a space-efficient cellular modem device" term disposes of NimbeLink Corp.'s claims against Digi International, Inc. for infringement of the Asserted Patents, and Digi's Counterclaims I–IV, which seek declaratory judgments of non-infringement and invalidity of the Asserted Patents. (ECF No. 245 at 2.) The parties further stipulate that the Court may enter judgment that all asserted claims of the Asserted Patents are invalid

due to indefiniteness under Section 112(b), and that Digi therefore does not infringe any valid claims of the Asserted Patents, without prejudice to NimbeLink's rights to appeal the Claim Construction Order.[1] (*Id.* at 3.)

Based on the foregoing and the parties' stipulation, the Court hereby ENTERS JUDGMENT that all asserted claims of the Asserted Patents are invalid due to indefiniteness under 35 U.S.C. Section 112(b), and that Digi therefore does not infringe any valid claims of the Asserted Patents, without prejudice to NimbeLink's rights to appeal the Court's Claim Construction Order.

Digi's counterclaims asserting inequitable conduct by NimbeLink (Counterclaims V and VI) remain pending.

Dated: March 28, 2024

s/Nancy E. Brasel
Nancy E. Brasel
United States District Court

[1] NimbeLink reserves its right to obtain appellate review of the Court's Claim Construction Order and the Final Judgment to be entered in this case. (ECF No. 245 at 2.)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| NIMBELINK CORP.,<br><br>Plaintiff,<br><br>v.<br><br>DIGI INTERNATIONAL INC.,<br><br>Defendant. | Case No. 22-CV-2345 (NEB/DJF)<br><br><br><br>CLAIM CONSTRUCTION ORDER |

The Court is asked to construe terms of patents covering embedded cellular modems. NimbeLink Corp. sued Digi International Inc. alleging infringement of two patents related to the modems: U.S. Patent Nos. 9,497,570 ("'570 Patent") and 9,838,066 ("'066 Patent"). (ECF Nos. 97-2 ('570 Patent), 97-3 ('066 Patent).) The parties prepared a joint claim construction statement, and each side submitted briefs on claim construction issues. The Court held a *Markman*[1] hearing, after which, the parties submitted letter briefs. (ECF Nos. 145–46.)

**BACKGROUND**

The '570 Patent and '066 Patent (together, "Asserted Patents") are titled "Embedded Wireless Modem" and cover embedded cellular modems: modems that can be incorporated into other devices to allow those devices to communicate with other

[1] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

machines or computers over a cellular network. ('570 Patent[2] at 1:11–27.) The parties ask the Court to construe four of the Asserted Patents' claim terms.[3]

**GENERAL PRINCIPLES**

Courts, rather than juries, are to construe patent claims. *Markman*, 517 U.S. at 391. In construing claims, courts give claims their ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

"[B]ecause patentees frequently use terms idiosyncratically," courts look to intrinsic evidence, including "the words of the claims themselves, the remainder of the specification, [and] the prosecution history," as well as "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1314 (citation omitted). The claims "provide substantial guidance as to the meaning of particular claim terms," but they "do not stand alone." *Id.* at 1314–15. They are part of "'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims," and must therefore "be read in view of the specification." *Id.*

---

[2] The parties agree that the specifications for the Asserted Patents are the same, and so they cited only the '570 Patent specification. The Court will do the same.

[3] The parties originally disputed the construction of six terms. (ECF No. 89-1.) Digi later withdrew its request relating to the terms "a first side" and "a second side," narrowing the claims at issue to four. (ECF No. 101 at 32 n.15.)

at 1315 (citations omitted). The specification is "highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

Courts may also consider a patent's prosecution history in construing claims terms, because "[l]ike the specification, the prosecution history provides evidence of how the [United States Patent and Trademark Office ("PTO")] and the inventor understood the patent." *Id.* at 1317. The prosecution history may "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* But "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*; *see Arctic Cat Inc. v. Polaris Indus. Inc.*, No. 16-CV-0010 (WMW/HB), 2017 WL 11679225, at *3 (D. Minn. Dec. 20, 2017) ("Although the patent's prosecution history may be used to understand the claim terms, it cannot enlarge, diminish, or vary the claim limitations.").

Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips,* 415 F.3d at 1317 (citation omitted). While extrinsic evidence "can shed useful light on the relevant art," it "is less significant than the intrinsic record in determining the

'legally operative meaning of disputed claim language.'" *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) (citation omitted). Extrinsic evidence is viewed as "less reliable" than intrinsic evidence. *Phillips*, 415 F.3d at 1318.

**CLAIM CONSTRUCTION**

This is a case about modems—more specifically, embedded modems—and more specifically yet, embedded cellular modems. Modems are hardware devices that provide a connection to the internet, cellular networks, or other connected devices. (ECF No. 102-3 ¶ 43.) Embedded modems are incorporated into larger machines (*e.g.*, ATMs or vehicles), to connect those machines to other machines as part of the "Internet of Things." (*Id.* ¶ 44.) In 2005, Digi introduced a line of embedded modems called the XBee® embedded modems, which operates via radio frequency. (*Id.* ¶ 45.) The Asserted Patents relate to embedded cellular modems, which provide connections via a cellular network. (*Id.* ¶ 46.) Embedded cellular modems are generally known and available from several companies. (*Id.*) Two examples include the Digi XBee® Radio Frequency (RF) Modems and the SODAQ GPRSbee Embedded Cellular Modems:




Digi XBee® RF Modem




GPRSbee Modem

(*Id.* ¶ 54.)

The Asserted Patents describe the "present invention" as "space-efficient embedded cellular modems for machine-to-machine communication." ('570 Patent at 1:12–14.) While the parties dispute the construction of four claim terms in the Asserted Patents, (ECF No. 89-1), at the heart of the dispute is the term "a space-efficient cellular modem device."

**I. "a space-efficient cellular modem device"**

The term "a space-efficient cellular modem device" is found in the preamble of all asserted claims. Digi maintains that this preamble is a claim limitation, the limitation is indefinite, and thus all claims—and the Asserted Patents—are invalid by operation of law. (*E.g.*, ECF No. 145 at 1.) NimbeLink agrees that the preamble is a claim limitation, but *only* if the Court adopts its proposed construction of the term: "the preamble phrase 'a space-efficient cellular modem device,' *if construed to mean* 'a cellular modem device incorporating a multi-layer PCB and with a footprint consistent with the footprint of an XBee form factor,'" *is limiting*." (ECF No. 96 at 14[4] (emphasis added).)

In a post-hearing letter brief, NimbeLink acknowledges that "if the meaning of a claim term in a preamble is in dispute, the Court must determine whether that term is limiting. Therefore, *the first question the Court must address is whether the term 'space efficient' is limiting*." (ECF No. 146 at 1 (citing *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1357

[4] All page citations to the record reference ECF pagination unless otherwise noted.

(Fed. Cir. 2012)).) Because the parties agree on the order of analysis and because it is the most efficient approach, the Court first considers whether the preamble is a claim limitation, then addresses whether the term is indefinite or can be construed.

### *A. The Preamble Is a Claim Limitation*

"Generally, the preamble does not limit the claims." *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1236 (Fed. Cir. 2017) (citation omitted). Whether to treat a preamble as a claim limitation is determined on a review of the entire patent to understand "what the inventors actually invented and intended to encompass by the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (citation omitted). A preamble may limit the claims if: it recites "additional structure or steps underscored as important by the specification"; claims depend on "a particular disputed preamble phrase for antecedent basis"; the preamble recites essential structure or steps or is essential to understand limitations or terms in the claim body; or there was "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art." *Holland*, 867 F.3d at 1236 (citing *Catalina Mktg.*, 289 F.3d at 808). By contrast, a preamble is not limiting "if the claim body defines a structurally complete invention and uses the preamble only to state a purpose or intended use for the invention." *Id.* (cleaned up, citation omitted). Nor does a preamble limit claim scope where the preamble language merely extolls benefits or features of the claimed invention "without clear reliance on those benefits or features as patentably significant." *Id.* (citing

*Catalina Mktg.*, 289 F.3d at 809). "In general, a preamble is limiting if it is 'necessary to give life, meaning, and vitality' to the claim." *Deere & Co.*, 703 F.3d at 1357 (citation omitted).

The preamble here is limiting because it recites additional structure that is underscored as important by the specification. The Field of the Invention section of the specification refers to "the present invention" as "space-efficient embedded cellular modems." ('507 Patent at 1:12–14; *see also id.*, Abstract (describing the invention as "[a] space-efficient cellular modem device").) "When the specification describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Lemoine v. Mossberg Corp.*, No. 2020-2140, 2021 WL 4199934, at *3 (Fed. Cir. Sept. 15, 2021) (affirming district court's conclusion that a preamble was limiting) (citing *Honeywell Int'l, Inc. v. ITT Indus.*, 452 F.3d 1312, 1318–19 (Fed. Cir. 2006)); *see Deere & Co.*, 703 F.3d at 1358 (holding that the preamble phrase "rotary cutter deck" was a limitation where the specification referred to "present invention" as a "rotary cutter deck"). The Summary of Invention, Brief Description, and Detailed Description sections repeatedly describe the invention and embodiments as "space-efficient cellular modem" devices.[5] ('507 Patent at

[5] Moreover, the Background of the Invention section recognizes that "generally known, presently-used modems . . . typically require a . . . large footprint," ('570 Patent at 1:29–31), and the Summary of the Invention section explains that "[e]mbodiments of the invention comprise various space-efficient, embedded cellular modems." *(Id.* at 1:36–37.) According to NimbeLink, "[t]his disclosure makes clear that 'space-efficient' modems embodying the invention do not have the 'large footprint' of 'presently known modems,'" *i.e.*, the inventors were working on the "large footprint" problem. (ECF

1:36–41, 1:56–57, 2:20–21, 4:19–20; *see also id.* at 5:2–4 (identifying "unique features and benefits" including "[t]he space-efficient size of embedded cellular modem")). That the specification repeatedly mentions "space-efficient" "underscore[s] the importance of the feature to the claimed invention." *Rotatable Techs. LLC v. Motorola Mobility LLC*, 567 F. App'x 941, 943 (Fed. Cir. 2014) (affirming the district court's finding that the preamble phrase "selectively rotating" was limiting).

The repeated references to "space-efficient" in the specification indicate that the preamble was intended to give life, meaning, and vitality to the claims.[6] The Court concludes that Digi has proven by clear and convincing evidence that the preamble is limiting.

NimbeLink acknowledges that if the preamble is limiting, the Court's next step is "to address the proper construction of this term, whether it be NimbeLink's proposed construction . . . or the Court's own construction." (ECF No. 146 at 2.) Digi asserts that the term "a space-efficient cellular modem device" is indefinite. NimbeLink argues that a term that is limiting cannot also be indefinite, and thus the Court need not proceed to

---

No. 127 at 5.) A preamble may "give 'life and meaning' and provide further positive limitations to the invention claimed" where the "specification makes clear that the inventors were working on the particular problem" at issue and "not on general improvements . . . ." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989). That was the case here.

[6] NimbeLink agrees that "space-efficient" is limiting because it is "necessary to give life, meaning, and vitality to the claim," (ECF No. 127 at 24), but only if the Court adopts NimbeLink's proposed construction of this term. (*Id.* at 25.)

an indefiniteness inquiry. (*Id.*) For this proposition, NimbeLink cites *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336 (Fed. Cir. 2002). *Allen* does not hold that a preamble that is limiting cannot be indefinite; there, the court determined that the preamble was indefinite before concluding it was not limiting. *See id.* at 1347 (explaining that the preamble term "fast steering" was "a relative term" with "no interpretive frame of reference" in the claims or specification, and concluding that the term "fail[ed] to give life, meaning and vitality" to the claimed structure and thus was not a claim limitation). More recently, courts have found a preamble to be both limiting and indefinite.[7]

Thus, having found the preamble to be limiting, the Court will consider whether "a space-efficient cellular modem device" can be construed or is indefinite. *See JobDiva*, 2014 WL 5034674, at *14 ("Put simply, the Court first must try to construe the term as it would any other . . . . If, in undertaking this process, the Court cannot construe the term, then the Court must assess whether there is clear and convincing evidence of indefiniteness."). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Nature*

---

[7] *See, e.g.*, *Unwired Planet L.L.C. v. Google, Inc.*, 660 F. App'x 974, 986 (Fed. Cir. 2016) (affirming the district court's finding that certain claims were invalid as indefinite after finding that a preamble had "patentable weight"); *HIP, Inc. v. Hormel Foods Corp.*, No. CV 18-615-CFC, 2019 WL 2579266, at *5 (D. Del. June 24, 2019) (finding that a preamble previously found to be limiting was purely subjective and the patent was invalid as indefinite), *aff'd*, 796 F. App'x 748 (Fed. Cir. 2020); *JobDiva, Inc. v. Monster Worldwide, Inc.*, No. 13-CV-8229 KBF, 2014 WL 5034674, at *14 (S.D.N.Y. Oct. 3, 2014) ("[G]iven that this Court has found that the entire preamble is limiting, the Court must address the next question: is it indefinite?").

*Simulation Sys. Inc. v. Autodesk, Inc.*, 50 F.4th 1358, 1360 (Fed. Cir. 2022) (citing *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1378 (Fed. Cir. 1999)); *see Haddad v. United States*, 164 Fed. Cl. 28, 40 (2023) ("Claim construction may contain indefiniteness inquiries . . . ."); *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010) ("If a claim is indefinite, the claim, by definition, cannot be construed.").

### *B. The Term is Indefinite*

The parties dispute whether the term "a space-efficient cellular modem device" is indefinite or should be construed as NimbeLink proposes. Under Section 112 of the Patent Act, a patent specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor . . . regards as the invention." 35 U.S.C. § 112(b). This is a requirement of definiteness. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 902 (2014). And it matters, because "[a] lack of definiteness renders invalid the patent or any claim in suit." *Id.* (quotation marks and citation omitted). United States patents are presumed valid, 35 U.S.C. § 282(a), and so courts must attempt to construe claims to preserve their validity. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1335 n.6 (Fed. Cir. 2003) (concluding the district court contradicted this canon when its claim construction inevitably required the invalidation of claims for indefiniteness). Indefiniteness is a question of law governed by "the same principles that generally govern claim construction," *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008), and must be proven "by clear and convincing evidence." *Sonix*

*Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

A claim fails to satisfy Section 112(b) and is thus invalid for indefiniteness "if its language, when read in light of the specification and the prosecution history, fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Media Rts. Techs., Inc. v. Cap. One Fin. Corp.*, 800 F.3d 1366, 1371 (Fed Cir. 2015) (cleaned up, citing *Nautilus*, 572 U.S. at 901). "[A] claim is indefinite if its language 'might mean several different things and no informed and confident choice is available among the contending definitions.'" *Id.* (citing *Nautilus*, 572 U.S. at 911 n.8). "[T]he degree of precision necessary for adequate claims is a function of the nature of the subject matter." *Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n*, 936 F.3d 1353, 1359 (Fed. Cir. 2019) (citation omitted). The intrinsic record and relevant extrinsic evidence "can provide or help identify the necessary objective boundaries for claim scope." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1349 (Fed. Cir. 2022). Courts generally "begin with the language of the claims." *Sonix Tech.,* 844 F.3d at 1378.

Digi argues that "space-efficient" is indefinite; NimbeLink contends that it can be construed, and the proper construction of "space-efficient" is a cellular modem device "with a footprint consistent with the footprint of an XBee form factor." The argument shapes into three inquiries: First, whether the phrase "space-efficient" has discernable objective boundaries that make the term definite. Second, if "space-efficient" refers to the size of the claimed devices, whether a person of ordinary skill in the art would

understand "space-efficient" cellular modem device to mean a cellular modem device "with a footprint consistent with the footprint of an XBee form factor" as an indicator of size.[8] Third, whether NimbeLink's proposed construction violates the doctrine of claim differentiation.

*1. Discernable objective boundaries*

The parties agree that "space-efficient" is a "term of degree," which "necessarily calls for a comparison against some baseline." *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1395 (Fed. Cir. 2016). In using a term of degree, the patent "'must provide objective boundaries for those of skill in the art' in the context of the invention to be definite." *Niazi*, 30 F.4th at 1349 (citing *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014)). The written description is "*key* to determining whether a term of degree is indefinite." *Guangdong Alison*, 936 F.3d at 1361 (citing *Sonix Tech.*, 844 F.3d at 1378).

The Asserted Patents do not offer a clear method of measuring or determining space efficiency, nor do they offer any discernable objective boundaries by which a person of ordinary skill in the art[9] would understand the scope of the claims. The

---

[8] Digi does not offer an alternative construction of "space-efficient" in its briefing. At the *Markman* hearing, it noted that NimbeLink's response brief suggested an ordinary meaning: "a cellular modem that results in little or no waste of space; in other words, a small modem." (ECF No. 127 at 15 n.3.)

[9] The parties define a "person of ordinary skill in the art" similarly, asserting that such person would have had an undergraduate degree in electrical engineering, computer

specification teaches "[t]he <u>*space-efficient*</u> *size* of embedded cellular modem 100 *is enabled <u>by the use of</u> surface mount connectors to meet XBee pinout requirements while freeing up surface area*," suggesting a connection between "space-efficient" and surface mount connectors. ('570 Patent at 5:3–6 (emphases added).) The specification also teaches, in reference to Figure 6, that "[s]uch a multi-layer, or 4-layer in this embodiment, allows for <u>*efficient spacing*</u> *of surface-mounted components, connectors, and interfaces for the XBee form factor*." (*Id.* at 4:31–33 (emphases added).) Figure 6 shows a multi-layer PC board and the height of the board. (*Id.* at 4:29-30 ("PC Board 102 as assembled defines a height of only 0.062 in+/- 0.007 in.").)

Fig. 6




('570 Patent at Fig. 6.) Thus, the specification and Figure 6 link "space-efficient," the "efficient spacing of surface-mounted" features, and the height of the PC board.

NimbeLink dismisses the notion that "space-efficient" relates the efficient spacing of surface-mounted features and contends that "space-efficient" measures the cellular

---

engineering or science, physics, or a similar field, and some relevant experience. (ECF No. 89-4 at 1; ECF No. 89-5 at 2.) Digi suggests one year, and NimbeLink suggests two years, of relevant experience. Digi does not object to NimbeLink's other contention that the person have "a working knowledge of modems." (ECF No. 101 at 8 n.3; *see* ECF No. 89-4 at 1.)

modem device's size. It points to examples in the specification to argue that a space-efficient size is consistent with the footprint of an XBee form factor. The Federal Circuit has held that a term of degree was not indefinite where "the intrinsic evidence provided guidance as to the scope of the claims," including examples. *Sonix Tech.*, 844 F.3d at 1377 (discussing *Enzo Biochem*, 599 F.3d at 1334–35). And it is true that examples help: "examples in the specification may be used to inform those skilled in the art of the scope of the invention with reasonable certainty—thus demonstrating that the term is not indefinite—without being directly construed into the claim." *Guangdong Alison*, 936 F.3d at 1363; *see Interval Licensing*, 766 F.3d at 1373 (A patent that "defines a claim phrase through examples may satisfy the definiteness requirement.").

The specification contains several examples that reference an XBee-sized board. For instance, the specification teaches the invention's "unique features and benefits" include "[t]he *space-efficient size* of embedded cellular modem," and teaches that "the use of a micro-SIM card slot on an *XBee-sized board* provides unique advantages over known modems," and that its "multi-layer stackup approach . . . *minimizes size*." ('570 Patent at 5:2–4, 9–11, 16 (emphases added).) Similarly, Figures 5, 8, and 10 depict embodiments of the invention that include dimensions of the cellular modem device's base board or PC board:




('570 Patent at Figs. 5, 8, 10; *see id.* at 2:64–3:11 (explaining that Figures 5, 8, and 10 depict a "base board" or "PC board").) Referencing Figure 6, the specification teaches that "the *compact*, *space-efficient* embedded cellular modem . . . achieves the XBee form factor by utilizing a multi-layer PC board." (*Id.* at 4:19–21 (emphasis added).) Compact is defined as "occupying a small volume by reason of efficient use of space," suggesting that "space-efficient" refers to the modem's size. (ECF No. 131-1 ("Compact," Merriam-Webster Dictionary).) So these examples help NimbeLink's case.

In addition, language in the specification suggests that the size of the modem was important to the inventors. The Background of the Invention section of the specification notes that embedded cellular modems are "generally known," but that these devices "typically require a *large footprint*." ('570 Patent at 1:28–32 (emphasis added); *see* ECF No. 131-2 ("Footprint," Merriam-Webster Dictionary ("the area on a surface covered by something").) The next Summary of the Invention section describes the embodiments of the invention as "*space-efficient*, embedded cellular modems for use in M2M applications." ('570 Patent at 1:36–38 (emphasis added).) According to NimbeLink, the

Court can infer from the proximity of these sentences—though they are found in different sections—that the inventors intended to distinguish the space-efficient devices from the generally known devices that require a larger footprint. (ECF No. 127 at 15–16.)

At the *Markman* hearing, NimbeLink argued that the dependent claims that include dimension limitations show objective boundaries for determining space efficiency. (*E.g.*, '570 Patent claim 6 ("The cellular modem device of claim 1, wherein a length of the cellular modem device *does not exceed 40 mm* and the width of the cellular modem device *does not exceed 35 mm*." (emphasis added)); *see also id.*, claims 7, 16, 17; '066 Patent at claims 11, 18, 27.) "A person of ordinary skill would presume that a structure recited in a dependent claim will perform a function required of that structure in an independent claim." *Enzo Biochem*, 599 F.3d at 1334 (concluding that the term "not interfering substantially" in independent claims "allow[ed] for at least as much interference as that exhibited when the linkage group has the structure specified in the dependent claims").

Given the varied use of the term "space-efficient," the Court finds *Interval Licensing* to be instructive. 766 F.3d at 1368. There, the Federal Circuit considered a claim related to displaying content "in an unobtrusive manner that does not distract a user." *Id.* The court concluded that the phrase "unobtrusive manner" was a subjective term of degree that offered "no objective indication of the manner in which content images are to be displayed to the user." *Id.* at 1371. The court considered the specification and found it "at

best muddled, leaving one unsure of whether the 'unobtrusive manner' phrase has temporal dimensions as well as spatial dimensions. The hazy relationship between the claims and the written description fails to provide the clarity that the subjective claim language needs." *Id.* at 1372. After considering the prosecution history, the court concluded that the "unobtrusive manner" phrase had "too uncertain a relationship to the patents' embodiments" and lacked "an objective boundary."[10] *Id.* at 1373.

The same is true of "space-efficient"—it is unclear whether the objective boundary is (1) the efficient spacing of surface-mounted components, connectors, and interfaces or (2) the size of the modem. *See Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, No. 12-CV-2692 (JRT/LIB), 2016 WL 6832623, at *15 (D. Minn. Nov. 18, 2016) (concluding that the specification lacked "objective boundaries" for "defining or measuring"). Because the meaning of the term "space-efficient" is muddled, it has no discernable objective boundary.

Even if the Court agreed with NimbeLink that "space-efficient" refers to the

---

[10] Digi also argues that "space-efficient" is a subjective term. When a term of degree is "purely subjective" and the claim language provides "no objective indication of the manner in which content images are to be displayed to the user," the term leaves "the skilled artisan to consult the 'unpredictable vagaries of any one person's opinion,'" and thus is indefinite. *Sonix Tech.*, 844 F.3d at 1378 (citing *Interval Licensing*, 766 F.3d at 1371, 1373–74). The Court declines to find that "space-efficient" is purely subjective because it does not turn on a person's taste or opinion. *See id.* at 1378 (explaining that subjective terms involve "terms that were subjective in the sense that they turned on a person's tastes or opinion"); *Arctic Cat*, 2017 WL 11679225, at *6 (finding that "significantly above" and "substantially above" were terms of degree that were "not purely subjective, as they do not implicate matters of individual taste or preference").

device's size, this does not get NimbeLink very far: the question of *what* size is "space-efficient" would remain. For that, NimbeLink relies on its proposed construction to save the claim from indefiniteness.

2. *NimbeLink's proposed construction*

NimbeLink proposes that the Court construe "a space-efficient cellular modem device" as "a cellular modem device incorporating a multi-layer PCB and with a footprint consistent with the footprint of an XBee form factor."[11] The Court considers the patent language and the prosecution history to assess this proposed construction.

*Patent language.* NimbeLink maintains that the inventors used the footprint of an XBee form factor as the standard for determining that the claimed device was "space-efficient." (ECF No. 100 ¶ 10.) The specification teaches:

> Embodiments of the invention comprise various *space-efficient*, embedded cellular modems for use in M2M [machine-to-machine] applications. In an embodiment, cellular modems of the invention include a cellular transceiver module, U.FL antenna port, power management electronics, level shifter electronics, and an interface, *all in an XBee ® form factor*.

('570 Patent at 1:35–41 (emphases added); *see id.* at 5:10, 5:19–20 (twice describing

---

[11] The parties did not ask the Court to construe "XBee form factor." According to NimbeLink, "XBee form factor" means "a family of wireless connectivity devices that share a few 'form factors,' that is, size, shape, and other physical characteristics." (ECF No. 100 ¶ 9.) At the *Markman* hearing, Digi explained that it did not seek to construe XBee form factor because it relied on the specification's teaching of "XBee form factor" as referring to "pin connectors." (*See* '570 Patent at 4:7-9 ("Referring also to FIG. 4, *pin connectors* 110, as depicted, may comprise two 10-pin connectors, 110a and 110b, having a 2 mm pitch, *so as to comprise an XBee form factor*." (emphases added)).)

uniqueness of the "an XBee-sized board").)

The specification does not support NimbeLink's proposed construction. The proposed phrase "*footprint* of an XBee form factor" is not mentioned anywhere in the Asserted Patents. And the specification's references to the "XBee form factor" suggest a relation to height, rather than a footprint. The specification explains that, in referring to Figure 6, "the compact, space-efficient embedded cellular modem 100 *achieves the XBee form factor by utilizing a multi-layer PC board*," and that "[s]uch a multi-layer . . . allows for efficient spacing of surface-mounted components, connectors, and interfaces *for the XBee form factor*." ('570 Patent at 4:19–21, 4:31–33 (emphases added).) Figure 6 shows in an embodiment, and as depicted, the multi-layer PC board "defines a *height* of only 0.062 in+/-0.007 in." (*Id.* at 4:29–30 (emphasis added).)

Moreover, NimbeLink acknowledges that XBee form factors do not have a standard size or shape.[12] (*See* ECF No. 133 at 18 (claiming that the specification acknowledges multiple XBee form factors because it refers to "'*an* XBee form factor,' rather than '*the* XBee form factor'").) NimbeLink points to example dimensions referenced in the embodiments and dependent claims to support construing the term as

---

[12] Extrinsic evidence buttresses this conclusion. NimbeLink offers mechanical drawings of Digi's XBee® RF Modem showing the *trapezoidal* shapes and two sets of dimensions: 27.61 mm by 24.38 mm for the XBee, and 32.94 mm by 24.38 mm for the XBee PRO. (ECF No. 100 ¶ 10; ECF No. 98 at 7 (under seal).) By contrast, the provisional patent application no. 61/936,651 to which the Asserted Patents claim priority ("'651 Application") shows an "XBEE form factor" with *rectangular* dimensions of 29.00 mm x 33.60 mm. (ECF No. 97-4 at 41; *see* '570 Patent at 1:5–6 (incorporating the '651 Application).)

"having a footprint consistent with the footprint of an XBee form factor." The specification describes an embodiment of the claimed cellular modems that has dimensions of "33.60 mm x 29.00 mm," and, as shown above, Figures 5, 8, and 10 depict rectangular embodiments of that size. ('570 Patent at 4:16–17; *id.* at Figs. 5, 8, 10.) Some dependent claims also limit the area of the device. (*See id.* at claim 6 ("The cellular modem device of claim 1, wherein a length of the cellular modem device does not exceed 40 mm and the width of the cellular modem device does not exceed 35 mm."), claims 7, 16, 17; *see also* '066 Patent at claims 11, 18, 27.) According to NimbeLink, these examples of consistently sized cellular modems help explain the meaning of "space-efficient." *See, e.g.*, *Sonix Tech.*, 844 F.3d at 1379 (holding that the term "visually negligible" was not indefinite based in part on "examples of visually-negligible indicators"); *Niazi*, 30 F.4th at 1349–50 (holding that the terms "resilient" and "pliable" were not indefinite because the specification contained "numerous examples" of resilient and pliable materials); *Enzo Biochem*, 599 F.3d at 1334 (holding that for the term "not interfering substantially," the claims provided "at least some guidance as to how much interference will be tolerated").

NimbeLink cannot rely on the embodiments to define the meaning of the term "a space-efficient cellular modem device" because restricting a claim based on examples "would improperly import limitations from the specification into the claims, which should be avoided unless the patentee clearly 'intends for the claims and the embodiments in the specification to be strictly coextensive.'" *Pfizer, Inc. v. Ranbaxy Lab'ys,*

*Ltd.*, 457 F.3d 1284, 1290 (Fed. Cir. 2006) (citation omitted). Here, as in *Pfizer*, the specification states that the embodiments "are intended to be illustrative and not limiting." ('570 Patent at 5:39–40); *see Pfizer*, 457 F.3d at 1290. NimbeLink maintains that it does not seek to limit the scope of the invention; the embodiments are examples. Examples and procedures in the written description can provide "sufficient guidance and points of comparison to render claim terms not indefinite." *Guangdong Alison*, 936 F.3d at 1362. This may be so, but neither the embodiments nor the dependent claims tie back to "the footprint of an XBee form factor." Without objective boundaries for "the footprint of an XBee form factor," construing the term "space-efficient" to include a footprint would add confusion.

There is no reasonably clear and exclusive definition of the "space-efficient" term in the specification, and "[t]he hazy relationship between the claims and the written description fails to provide the clarity" that this claim language requires. *Interval Licensing*, 766 F.3d at 1372. Because the specification is "muddled, leaving one unsure of" the objective boundaries of the term, *id.*, the Court cannot construe the "space-efficient" term.

*Prosecution history*. The prosecution history neither supports NimbeLink's proposed construction nor saves the "space-efficient" term from indefiniteness. The '651 Application refers to an "XBee form factor" in claim 1:

> An embedded cellular modem as described substantially herein, and including a cellular transceiver, multi-layer PC board, an antenna port, and

> power management and level shift electronics, *packaged in an XBee form factor*.

(ECF No. 97-4 at 19 (emphasis added)); *see MPHJ Tech. Invs., LLC v. Ricoh Americas Corp.*, 847 F.3d 1363, 1369 (Fed. Cir. 2017) ("[A] provisional application can contribute to understanding the claims."). Later, NimbeLink's patent counsel removed "XBee form factor" from the independent claims in the '570 Patent and drafted two dependent claims directed to a cellular modem device that "conforms to an XBee form factor." (ECF No. 125-2 at 20–21, 24.) The independent claims in the '066 Patent also omit any reference to an "XBee form factor." (ECF No. 125-3 at 13.)

NimbeLink argues that the language omitted from the provisional claim was "*packaged in* an XBee form factor," which is different from "*the footprint of* an XBee form factor." (ECF No. 133 at 17–18 (emphases added).) According to NimbeLink, "packaged in" would include additional features of the XBee, including the specific pin architecture, while "footprint" refers only to the area of the device. The Court is unpersuaded by this distinction. The decision to include "XBee form factor" in the provisional claim, then omit it from the independent claims of the Asserted Patents, suggests that the inventors decided not to limit the independent claims of the Asserted Patents with references to an XBee form factor. The Court finds that the prosecution history supports its finding that the term "a space-efficient cellular modem device" is indefinite and cannot be construed

as NimbeLink proposes.[13]

## II. Summary

The Court concludes that the term "a space-efficient cellular modem device" is indefinite because the Asserted Patents' specification and prosecution history fail to provide a reasonably clear and exclusive definition of "space-efficient," leaving the term "without an objective boundary." *Interval Licensing*, 766 F.3d at 1373. As a result, the claims fail to inform, with reasonable certainty, persons skilled in the art about the scope of the inventions. *Nautilus*, 572 U.S. at 901. This finding of indefiniteness renders all asserted patent claims invalid under Section 112(b). *See id*. The Court declines to reach the remaining issues of claim construction. *See Pictometry Int'l Corp. v. GEOSPAN Corp.*, No. 11-CV-1423 (JRT/LIB), 2012 WL 3679208, at *11 (D. Minn. Aug. 17, 2012) ("Claim 16 is invalid for indefiniteness. The Court will, therefore, decline to construe the other disputed claim terms."). The parties are directed to file a stipulation to final judgment of invalidity consistent with this Order within seven days, or two-page letter briefs explaining why such a stipulation cannot be reached and how, if at all, this Order impacts

---

[13] Because of this conclusion, the Court declines to address Digi's argument that NimbeLink's proposed construction of "a space-efficient cellular modem device" violates the doctrine of claim differentiation.

NimbeLink's pending motion to dismiss.

Dated: March 14, 2024

s/Nancy E. Brasel
Nancy E. Brasel
United States District Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| NIMBELINK CORP.,<br><br>Plaintiff,<br><br>v.<br><br>DIGI INTERNATIONAL INC.,<br><br>Defendant. | Case No. 22-CV-2345 (NEB/DJF)<br><br><br><br>ORDER ON DEFENDANT'S MOTION TO DISMISS |

NimbeLink Corp. sued Digi International, Inc. for patent infringement relating to its Skywire™ product, breach of two non-disclosure agreements ("NDAs"), and unjust enrichment. Digi now moves to dismiss the claims for breach of the NDAs. For the reasons below, the Court grants the motion.

**BACKGROUND**[1]

NimbeLink designs, manufactures, and sells communications products and services, including a line of pluggable embedded cellular modems called Skywire™ modems. (Compl. ¶¶ 8–9.) The Skywire™ inventors filed patent applications in 2014 and 2016; U.S. Patent No. 9,497,570 B2 ("the '570 Patent") was issued in 2016, and a second patent was issued in 2017. (*Id.* ¶¶ 12–14.)

[1] The Court draws the following background from the complaint, accepting as true all its factual allegations and drawing all reasonable inferences in favor of the nonmovant. *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014).

In 2015, while the '570 Patent was pending, Digi approached NimbeLink for assistance with developing a product that would incorporate the Skywire™ product. (*Id.* ¶ 16.) NimbeLink and Digi entered into a non-disclosure agreement in June 2015 ("2015 NDA"). (*Id.* ¶ 17.) Under the 2015 NDA, "Proprietary Information[2] . . . may be used by the receiving Party for the purpose of exchanging information on product design." (ECF No. 1-3 ¶ 4.) Among other things, the 2015 NDA provides that "neither Party will be precluded from independently developing technology or pursuing business opportunities similar to those covered by this Agreement." (*Id.* ¶ 8.)

Digi expressed an interest in acquiring NimbeLink, and "asked NimbeLink to educate Digi regarding the Skywire™ product, NimbeLink's certification process, the market for the Skywire™ product, and NimbeLink's understanding of the market opportunities and basic business strategies." (Compl. ¶ 18.) NimbeLink and Digi representatives met twice in December 2015. (*Id.* ¶ 19.) Pursuant to the 2015 NDA,

---

[2] The 2015 NDA defined Proprietary Information as follows:

> Proprietary Information includes any and all current and future product information, business information, identity of current or future business partners, technical or financial information including but not limited to software source code, reports, plans, documents, drawings, inventions, and proposals (a) disclosed in tangible form clearly labeled or identified in writing as "confidential", "proprietary" or words of similar meaning at the time of disclosure or (b) disclosed in non-tangible form, identified as "confidential" or "proprietary" or words of similar meaning at the time of disclosure, and summarized in a writing designated as "confidential", "proprietary" or words of similar meaning, and delivered to the other Party within thirty (30) days after disclosure.

(ECF No. 1-3 ¶ 4.)

NimbeLink disclosed to Digi "detailed business and market strategy information that underlies the market success of the Skywire™ product" and "Proprietary Information regarding financial and marketing information." (*Id.* ¶¶ 19, 26.) "This information was confidential to NimbeLink . . . and NimbeLink took reasonable steps to protect the confidentiality of the information." (*Id.* ¶ 19.) The parties' discussions continued through January 2016, when Digi informed NimbeLink that it was no longer interested in acquisition. (*Id.* ¶¶ 19–20.)

In late 2016, Digi renewed its interest in acquiring NimbeLink. (*Id.* ¶ 22.) Digi requested financial and market information, including detailed financial information about the Skywire™ product and its market. (*Id.*) The parties entered into a second non-disclosure agreement ("2016 NDA"), and NimbeLink provided to Digi "the detailed market and financial information that it had requested." (*Id.; see id.* ¶ 32 ("Pursuant to the terms of the 2016 NDA, NimbeLink provided to Digi confidential financial and marketing information.").) Digi never acquired NimbeLink. (*Id.* ¶ 23.)

During the terms of the NDAs, Digi allegedly used NimbeLink's confidential information "for non-permitted uses, including for the purposes of developing its own cellular modem products and entering the market with those products." (*Id.* ¶¶ 27 (alleging misuse of "Proprietary Information"), 33 (alleging misuse of "confidential information"), 36; *see id.* ¶¶ 28, 34.) Digi allegedly breached the NDAs "by using NimbeLink's confidential information when it developed and introduced to the market

its XBee Cellular modem products" which are alleged to be "nearly identical" to the Skywire™ product. (*Id.* ¶¶ 36, 71, 78.) Digi announced the introduction of its XBee Cellular modem in January 2017, and has since expanded its XBee Cellular modem product line. (*Id.* ¶ 36.) NimbeLink alleges that Digi used, without authorization, the confidential information that NimbeLink had provided to Digi under the NDAs "to develop, manufacture, and sell" the XBee Cellular modem products, and in formulating its market strategies for them. (*Id.* ¶ 37.) In doing so, Digi allegedly breached the NDAs, causing NimbeLink to suffer damages. (*Id.* ¶¶ 29, 35, 37.)

Digi now moves to dismiss the claims for breach of the NDAs.

## ANALYSIS

### I. Legal Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). To survive a motion to dismiss under Rule 12(b)(6), "[t]he complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Horras v. Am. Cap. Strategies, Ltd.*, 729 F.3d 798, 801 (8th Cir. 2013) (citing *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). "Factual

allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555. At this stage in the litigation, the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *Topchian*, 760 F.3d at 848. "Ultimately, evaluation of a complaint upon a motion to dismiss is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). The Court assesses the plausibility of the complaint considering only the materials that are necessarily embraced by the pleadings and are exhibits to the complaint. *Trone Health Servs., Inc. v. Express Scripts Holding Co.*, 974 F.3d 845, 850 (8th Cir. 2020).

**II. Breach of Contract Claims**

To state a breach of contract claim, NimbeLink must show (1) formation of the contract; (2) performance by NimbeLink of any conditions precedent to its right to demand performance by Digi, and (3) Digi's breach of the contract.[3] *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011). Digi argues that the complaint fails to allege facts giving rise to plausible claims that Digi breached the NDAs. *See Eur. Roasterie, Inc. v. Dale*, No. 10-CV-53 (DWF/JJG), 2010 WL 1782239, at *5 (D. Minn. May 4, 2010)

[3] The parties do not dispute that the Minnesota law applies to the breach of contract claims. (*E.g.*, ECF No. 1-3 ¶ 11.)

(dismissing breach of contract claim because it lacked sufficient specificity). The Court agrees.

According to Digi, the complaint fails to allege facts plausibly establishing that Digi "used" NimbeLink's confidential information when it developed and introduced the XBee Cellular modem products. (ECF No. 11 at 16 (native pagination).) The complaint alleges that Digi used NimbeLink's confidential information "for non-permitted uses, including for the purposes of developing its own cellular modem products and entering the market with those products," and "us[ed] NimbeLink's confidential information when it developed and introduced to the market its XBee Cellular modem products." (Compl. ¶¶ 27, 33, 71, 78.) Even accepting all factual allegations as true and drawing all reasonable inferences in NimbeLink's favor, these bare-bones allegations of breach do not suffice.

The complaint alleges only generally that Digi used "financial and marketing information" provided by NimbeLink when it developed and introduced of its XBee products. (Compl. ¶¶ 26–27, 32–33.) It does not offer any factual allegations suggesting the nature of the confidential information Digi allegedly used. *See Schlief v. Nu-Source, Inc.*, No. 10-CV-4477 (DWF/SER), 2011 WL 1560672, at *4 (D. Minn. Apr. 25, 2011) (explaining that, at a minimum, a plaintiff "must plead *facts* identifying the type of . . . confidential information" to state a breach-of-confidentiality-agreement claim (emphasis added)); *cf. Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 411–12 (E.D.N.Y.

2012) (finding that the plaintiff plausibly alleged that the defendant "used its confidential information and/or trade secrets to create and implement a checkout display program in breach of . . . non-disclosure provisions" where the confidential information was alleged to be "checkout counter programs and its business model, plan-o-grams and designs, methods and procedures . . . including creating and designing the specific Program for Unified").

NimbeLink argues that, given the alleged "sequence of events," the Court can reasonably infer that Digi used the confidential information acquired from NimbeLink to "develop its own cellular modem products and enter the market with those products." (ECF No. 24 at 14 (native pagination).) But the timing alone does not plausibly allege a breach, particularly where the NDAs—which are incorporated into the complaint—specifically contemplate Digi developing its own competing products. The 2015 NDA states that neither party is precluded from independently developing technology or pursuing business opportunities similar to those covered by this Agreement. (ECF No. 1-3 ¶ 8.) The 2016 NDA provides that a violation cannot be inferred merely from Digi's use of the same or similar practices, techniques, concepts, or information as those used by NimbeLink or information disclosed pursuant to the parties' agreement. (ECF No. 13 at 4.) Nor does the 2016 NDA restrict Digi from engaging in any business that competes with NimbeLink. (*Id.*) As such, the Court cannot reasonably infer that Digi breached the NDAs based solely on its development of XBee Cellular modem products. And the

operative complaint fails to offer another plausible basis for the alleged breach.[4] *See Pension Advisory Grp., Ltd. v. Country Life Ins. Co.*, 771 F. Supp. 2d 680, 700–01 (S.D. Tex. 2011) (dismissing breach of contract claim because plaintiffs "have not sufficiently alleged the manner in which those contracts were breached"). The Court thus dismisses Counts III and IV without prejudice, and without reaching Digi's other arguments.

NimbeLink maintains that it can cure any deficiency with its breach of contract claims by filing an amended complaint under seal. The proper course is for NimbeLink to file a motion for leave to amend the complaint.

**CONCLUSION**

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED:

1. Defendant Digi International Inc.'s motion to dismiss (ECF No. 9) is GRANTED; and

[4] Digi raises the "obvious alternative explanation" that it independently developed the XBee Cellular modem products without NimbeLink's confidential information. (ECF No. 11 at 17 (citing *Iqbal*, 556 U.S. at 682)); *see Braden*, 588 F.3d at 597 ("[W]here there is a concrete, 'obvious alternative explanation' for the defendant's conduct . . . a plaintiff may be required to plead additional facts tending to rule out the alternative." (citations omitted)). The Court need not decide this issue because it finds the factual allegations lacking regardless.

2. Counts III and IV are DISMISSED WITHOUT PREJUDICE.

Dated: May 22, 2023

BY THE COURT:

s/Nancy E. Brasel
Nancy E. Brasel
United States District Judge

US009497570B2

(12) **United States Patent**
**Larson et al.**

(10) **Patent No.: US 9,497,570 B2**
(45) **Date of Patent: Nov. 15, 2016**

(54) **EMBEDDED WIRELESS MODEM**

(71) Applicant: **NimbeLink L.L.C.**, Plymouth, MN (US)

(72) Inventors: **Kurt T. Larson**, Plymouth, MN (US); **Christopher J. Elmquist**, Mahtomedi, MN (US)

(73) Assignee: **NIMBELINK CORP.**, Plymouth, MN (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/616,118**

(22) Filed: **Feb. 6, 2015**

(65) **Prior Publication Data**

US 2015/0256212 A1 Sep. 10, 2015

**Related U.S. Application Data**

(60) Provisional application No. 61/936,615, filed on Feb. 6, 2014.

(51) **Int. Cl.**
***H04W 4/00*** (2009.01)

(52) **U.S. Cl.**
CPC .................................... ***H04W 4/005*** (2013.01)

(58) **Field of Classification Search**
CPC ................. H04L 12/2898; H04M 2215/2086; H04M 3/304; H04Q 2213/13199; H04Q 2213/199
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D206,327 | S | 11/1966 | Keys |
| 3,602,846 | A | 8/1971 | Hauser |
| 3,762,039 | A | 10/1973 | Douglass et al. |
| 3,825,876 | A | 7/1974 | Damon et al. |
| 3,846,734 | A | 11/1974 | Pauza et al. |
| 4,218,724 | A | 8/1980 | Kaufman |
| D260,091 | S | 8/1981 | Mochizuki et al. |
| D261,760 | S | 11/1981 | Dlugos |
| D286,053 | S | 10/1986 | McDaniel et al. |
| 4,630,174 | A | 12/1986 | Kaufman |
| D288,557 | S | 3/1987 | Du Bois |
| D288,922 | S | 3/1987 | Olla |
| 4,663,833 | A | 5/1987 | Tanaka et al. |
| D316,848 | S | 5/1991 | Hasegawa et al. |
| D317,300 | S | 6/1991 | Hasegawa et al. |
| D318,271 | S | 7/1991 | Hasegawa et al. |
| D320,212 | S | 9/1991 | Someya |
| 5,221,859 | A | 6/1993 | Kobayashi et al. |
| D345,731 | S | 4/1994 | Owens et al. |
| 5,369,551 | A | 11/1994 | Gore et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

HK EP 2182643 A2 * 5/2010 ........... H04B 1/3827

*Primary Examiner* — Lewis West
(74) *Attorney, Agent, or Firm* — Christensen Fonder P.A.

(57) **ABSTRACT**

A space-efficient cellular modem device for machine-to-machine communications that includes: a multi-layer printed circuit board defining a top side and a bottom side and including a first circuit layer adjacent the top side, a second circuit layer adjacent the bottom side, a ground plane layer, and a power plane layer, the ground and power plane layers located between the first and second circuit layers; a cellular transceiver module configured to communicate over a cellular wireless cellular network; electrical power-management components attached to the multi-layer printed circuit board, the power-management components in electrical communication with the cellular transceiver module; first and second rows of pins in electrical communication with the cellular transceiver; and a communications port.

**20 Claims, 21 Drawing Sheets**




4 LAYER STACK-UP

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | | |
|---|---|---|---|---|
| D357,462 | S | 4/1995 | Terasawa et al. | |
| D357,671 | S | 4/1995 | Terasawa et al. | |
| D357,672 | S | 4/1995 | Terasawa et al. | |
| D358,805 | S | 5/1995 | Siegel et al. | |
| D360,619 | S | 7/1995 | Terasawa et al. | |
| 5,434,357 | A | 7/1995 | Belcher et al. | |
| 5,444,297 | A | 8/1995 | Oshima et al. | |
| D364,399 | S | 11/1995 | Long | |
| 5,552,631 | A | 9/1996 | McCormick | |
| 5,635,670 | A | 6/1997 | Kubota et al. | |
| D389,808 | S | 1/1998 | Yamada et al. | |
| 5,757,070 | A | 5/1998 | Fritz | |
| D396,450 | S | 7/1998 | Nishiura et al. | |
| D396,471 | S | 7/1998 | Kolinen | |
| D396,846 | S | 8/1998 | Nakayama et al. | |
| D396,847 | S | 8/1998 | Nakayama et al. | |
| 5,798,570 | A | 8/1998 | Watanabe et al. | |
| D401,912 | S | 12/1998 | Majumdar et al. | |
| 5,844,307 | A | 12/1998 | Suzuki et al. | |
| 5,959,846 | A | 9/1999 | Noguchi et al. | |
| D416,872 | S | 11/1999 | Burke | |
| 5,998,242 | A | 12/1999 | Kirkpatrick et al. | |
| D418,485 | S | 1/2000 | Kawafuji et al. | |
| D421,969 | S | 3/2000 | Kawafuji et al. | |
| D432,097 | S | 10/2000 | Song et al. | |
| 6,166,430 | A | 12/2000 | Yamaguchi | |
| D442,171 | S | 5/2001 | Jang | |
| D444,132 | S | 6/2001 | Iwanishi et al. | |
| D448,739 | S | 10/2001 | Iwasaki et al. | |
| D453,746 | S | 2/2002 | Kato et al. | |
| 6,358,776 | B1 | 3/2002 | Takehara et al. | |
| D459,705 | S | 7/2002 | Yokota et al. | |
| D466,485 | S | 12/2002 | Maehara et al. | |
| D466,873 | S | 12/2002 | Kasem et al. | |
| D470,463 | S | 2/2003 | Iwasaki et al. | |
| D470,825 | S | 2/2003 | Iwasaki et al. | |
| 6,521,983 | B1 | 2/2003 | Yoshimatsu et al. | |
| D472,528 | S | 4/2003 | Kasem et al. | |
| D472,547 | S | 4/2003 | Dendou et al. | |
| D476,959 | S | 7/2003 | Yamada et al. | |
| D476,962 | S | 7/2003 | Yoshihira et al. | |
| D489,338 | S | 5/2004 | Seddon et al. | |
| D502,684 | S | 3/2005 | Koshiishi | |
| D505,399 | S | 5/2005 | Yoshida et al. | |
| D505,400 | S | 5/2005 | Kawafuji et al. | |
| D507,544 | S | 7/2005 | Wang et al. | |
| D510,728 | S | 10/2005 | Celaya et al. | |
| D515,046 | S | 2/2006 | Kaprelian | |
| 6,995,461 | B2 | 2/2006 | Soyano et al. | |
| D530,316 | S | 10/2006 | Hsu et al. | |
| 7,130,942 | B2 | 10/2006 | Gemelli et al. | |
| 7,166,496 | B1 | 1/2007 | Lopez et al. | |
| D548,203 | S | 8/2007 | Takahashi | |
| D550,172 | S | 9/2007 | Aguilar | |
| 7,299,427 | B2 | 11/2007 | Settles | |
| D564,502 | S | 3/2008 | Johnson et al. | |
| 7,425,757 | B2 | 9/2008 | Takubo | |
| D590,827 | S | 4/2009 | Song | |
| D594,827 | S | 6/2009 | Loh et al. | |
| D606,951 | S | 12/2009 | Soyano et al. | |
| 7,706,146 | B2 | 4/2010 | Lee et al. | |
| 7,868,451 | B2 | 1/2011 | Muramatsu et al. | |
| 7,881,457 | B1 | 2/2011 | Chen et al. | |
| D635,106 | S | 3/2011 | Cheng et al. | |
| 8,049,312 | B2 | 11/2011 | Herbsommer et al. | |
| 8,093,692 | B2 | 1/2012 | Obara | |
| 8,102,655 | B2 | 1/2012 | Sakamoto et al. | |
| 8,107,255 | B2 | 1/2012 | Sakamoto et al. | |
| D653,634 | S | 2/2012 | Soyano | |
| D655,697 | S | 3/2012 | Petsch | |
| D664,544 | S | 7/2012 | Yi et al. | |
| D673,921 | S | 1/2013 | Ozawa | |
| D674,760 | S | 1/2013 | Mochizuki et al. | |
| D686,174 | S | 7/2013 | Soyano | |
| 8,494,582 | B1 * | 7/2013 | Ellis .................... | H04M 1/0254 455/41.2 |
| D689,446 | S | 9/2013 | Soyano | |
| D696,653 | S | 12/2013 | Ohashi et al. | |
| D705,184 | S | 5/2014 | Takahashi et al. | |
| D706,232 | S | 6/2014 | Nakamura | |
| D706,249 | S | 6/2014 | Holzer | |
| D715,234 | S | 10/2014 | Chan et al. | |
| D717,254 | S | 11/2014 | Jo et al. | |
| D719,115 | S | 12/2014 | Liu et al. | |
| D719,537 | S | 12/2014 | Kawase et al. | |
| D719,926 | S | 12/2014 | Sohn et al. | |
| D731,491 | S | 6/2015 | Larson et al. | |
| 2003/0042584 | A1 | 3/2003 | Yamaguchi | |
| 2003/0192949 | A1 | 10/2003 | Hattersley et al. | |
| 2006/0041919 | A1 | 2/2006 | Tokunaga et al. | |
| 2008/0155630 | A1 | 6/2008 | Oosawa | |
| 2008/0160931 | A1 * | 7/2008 | Rofougaran ............ | H01L 23/66 455/90.3 |
| 2010/0149774 | A1 | 6/2010 | Matsumoto et al. | |
| 2011/0298137 | A1 | 12/2011 | Pagaila et al. | |
| 2013/0088251 | A1 | 4/2013 | Choi et al. | |
| 2013/0316762 | A1 * | 11/2013 | Charbit ............... | H04W 76/023 455/552.1 |
| 2014/0001651 | A1 | 1/2014 | Nickerson et al. | |
| 2014/0001652 | A1 | 1/2014 | Chen et al. | |
| 2014/0008776 | A1 | 1/2014 | Soller | |
| 2014/0061950 | A1 | 3/2014 | Zhai | |
| 2014/0084478 | A1 | 3/2014 | Simion | |
| 2014/0091461 | A1 | 4/2014 | Shen | |
| 2014/0110820 | A1 | 4/2014 | Standing et al. | |
| 2014/0113460 | A1 | 4/2014 | Park et al. | |
| 2014/0119690 | A1 | 5/2014 | Matsumoto et al. | |
| 2014/0131854 | A1 | 5/2014 | Hawk et al. | |
| 2014/0140657 | A1 | 5/2014 | Shiraishi | |
| 2014/0177997 | A1 | 6/2014 | Huang | |
| 2014/0270626 | A1 | 9/2014 | Isenhour et al. | |
| 2014/0270629 | A1 | 9/2014 | Dutt et al. | |
| 2014/0270630 | A1 | 9/2014 | Kropp | |
| 2014/0274015 | A1 * | 9/2014 | Regan ............... | H04W 1/72525 455/418 |
| 2014/0321807 | A1 | 10/2014 | Sakai et al. | |
| 2014/0348462 | A1 | 11/2014 | Yabre | |
| 2015/0003775 | A1 | 1/2015 | Saado | |
| 2015/0023632 | A1 | 1/2015 | Lan et al. | |
| 2015/0030281 | A1 | 1/2015 | Chan et al. | |
| 2015/0036970 | A1 | 2/2015 | Lai et al. | |


* cited by examiner

*Fig. 1*



*Fig. 2*



106
U.FL CONNECTION
100
104
TELIT
CE910-DUAL
108
POWER
MANAGEMENT
110a
110b
LEVEL
SHIFTERS
108
XBEE
INTERFACE
112



U4
TPS73801DCQR
VCC_3V5-4V3
VCC_3V4-4V2
C18 10uF 0603
C19 10uF 0603
R70 9.76K
R71 4.02K
IN OUT EN GND GND NR/FB
DGND
VIO_MODEM
VCC_REF
C2 0.1uF 0603
U2
1009743
VCCB VCCA
B1 B2 B3 B4 B5 B6 B7 B8 VSS
A1 A2 A3 A4 A5 A6 A7 A8 OE
DOUT
CTS/DIO7
DIN
DTR/SLEP_RQ/DI8
RTS/AD6/IO6
RX_MODEM
CTS_MODEM
TX_MODEM
DTR_MODEM
DSR_MODEM
DCD_MODEM
RTS_MODEM
RING_MODEM
C3 0.1uF 0603
100
U1
Telit CE910
ON/OFF R12 ON_OFF
RESET_nIN R13 HW_SHUTDOWN
ADC1 B1 ADC_IN1
M15 C104/RXD
N15 C103/TXD
P15 C106/CTS
M14 C108/DTR
P14 C107/DSR
N14 C109/DCD
L14 C105/RTS
R14 C125/RING
B2 EAR+
B3 EAR-
B4 MIC+
B5 MIC-
E15 RX_AUX
D15 TX_AUX
SIMVCC A3 RUIMVCC
SIMMIO A5 RUIMIO
SIMCLK A6 RUIMCLK
SIMnRST A7 RUIMRST
VUSB A13 VUSB
USB_D+ B15 USB_D+
USB_D- C15 USB_D-
104
R69 0 OHM 0603
C1 0.1uF 0603
VBATT_PA VBATT_PA VBATT_PA VBATT_PA VBATT VBATT VAUX/PWRMON VRTC
P2 P1 N2 N1 M2 M1 R11 C14
GND
H1 A2 E2 F2 G2 H2 J2 K2 L2 R2 M3 N3 P3 R3 D4 M4 N4 P4 R4 N5 P5 R5 N6 P6 R6 P8 P9 P10 M12 B13 P13 E14
J1
VCC_3V5-4V3
DOUT
DIN
DO8
RESTE_nIN
PWM0/RSSI
PWM1
Reserved
DTR/SLEEP_RQ/DI8
DGND
VUSB
USB_D+
USB_D-
Socket_10
Commissioning PIN
J2
ON_OFF
ADC1
DIO2
DIO3
RTS/AD6/IO6
DIO5
VREF
ON/nSLEEP
CTS/DIO7
DIO4


FIG. 3A



104
VCC_3V4-4V2
C4 10uF 0603
C5 10uF 0603
C6 10uF 0603
C7 10uF 0603
C8 10uF 0603
C9 10uF 0603
C11 10uF 0603
C12 10uF 0603
C13 10uF 0603
DGND
VCC_REF
L1 43nH
C20 56pF
X1 1002292 U.FL-R-SMT(10)
X2 U.FL-R-SMT(10)
X3 U.FL-R-SMT(10)
D1 Green LTST-C170GKT
R72 330
Q1 N-CH FDV301N (RoHS)
ON/nSLEEP
DIO3
DIO2
SIMVCC
SIMnRST
SIMCLK
SIMMIO
C14 1uF 0603
C15 33pF 0603
C16 33pF 0603
C17 33pF 0603
R73 15.0K
J3 47388-3001 SIM CARD SLOT
R74 0 OHM
GND
Antenna
Reserved
GPIO_01
GPIO_02
GPIO_03
GPIO_04
GPIO_05
GPIO_06
GPIO_07
GPIO_08
GPIO_09
GPIO_10
DVI_CLK
DVI_RX
DVI_TX
DVI_WAO


FIG. 3B

*Fig. 4*


1.60
110
4.30
2.00
(n-1) x 2.00
0.50x0.20
n x 2.00 + 0.50
R
2.40
110
2.50
Ø0.80±0.05
110
2.00
(n-1) x 2.00

*Fig. 5*


116
2.00
1
20
33.60
7.75
10
11
3.56
25.56
29.00

*Fig. 6*




4 LAYER STACK-UP

Fig. 7



106
CELLULAR
U.FL CONNECTIONS
100
TELIT
DE910-DUAL
106
GPS AND
GLONASS
POWER
MANAGEMENT
LEVEL
SHIFTERS
XBEE
INTEFACE


Fig. 8



106
1
20
2.00
DIVERSITY
116
33.60
PRIMARY
33.60
31.75
7.75
106
10
11
GPS
3.56
3.15
10.85
18.10
25.45
25.56
29.00

***Fig. 9***


U.FL CONNECTIONS
100
120
TELIT
DE910-DUAL
MICRO-SIM
SLOT
POWER
MANAGEMENT
LEVEL
SHIFTERS
XBEE
INTEFACE

***Fig. 10***


106
1
20
X1
2.00
116
33.60
MICRO
SIM
SLOT
7.75
10
11
120
3.56
25.56
29.00

Fig. 11a



Fig. 12a



Fig. 13a





Fig. 13b



Fig. 12b



Fig. 11b

Fig. 11c



Fig. 12c



Fig. 13c



Fig. 11d



Fig. 12d



Fig. 13d



Fig. 11e



Fig. 12e



Fig. 13e



Fig. 11f



Fig. 12f



Fig. 13f



Fig. 11g



Fig. 12g



Fig. 13g



*Fig. 14*


POWER MANAGEMENT
12V POWER
DEBUG HEADERS
DIPOLE ANTENNA
SKYWIRE CELLULAR MODEM
U.FL
CE910 USB
USB MINI-B
UART
MUX
UART TO USB
USB MINI-B
UNIVERSAL CPU CONNECTION
ARDUINO SHIELD INTERFACE

Case: 24-2292 Document: 10 Page: 128 Filed: 11/05/2024

*Fig. 15*



*Fig. 16*


MSM_IO_VREF
R8
10K
SERIAL MODEM
U2
CD74AC541M
20 VCC
19 OE2
OE1 1
THIS BUFFER ROUTES USB
SERIAL PORT SIGNALS TO
MODEM UART AND DISABLES
ONBOARD MCU.
MSM_IO_VREF
VCC5V_USB
D6
MBR0530
MCU_5V
D7
MBR0530
SERIAL MODEM
J6
3 PIN HEADER
1
2
DGND
MSM_DIN 18 Y0
MSM_RTS 17 Y1
MSM_DTR 16 Y2
15 Y3
14 Y4
13 Y5
SERIAL_RX 12 Y6
SERIAL_CTS 11 Y7
A0 2 SERIAL_TX
A1 3 SERIAL_RTS
A2 4 SERIAL_DTR
A3 5
A4 6
A5 7
A6 8 MSM_DOUT
A7 9 MSM_CTS
GND 10
DGND
THIS HEADER SELECTS BEHAVIOR
OF USB SERIAL PORT, SHORTING
PINS 1 AND 2 TIES MODEM DIRECTLY
TO SERIAL PORT, ARDIUNO AND EXTERNAL
CPU ON J6 MUST NOT BE USED. LEAVING J6
JUMPER OFF ALLOWS FOR ARDUINO
OR EXTERNAL CPU CONNECTION.
REMOVING JUMPER FROM ALL PINS ON
J6 ALLOWS EXTERNAL CPU/MCU TO BE
CONNECTED DIRECTLY TO MODEM AT TTL
LEVELS EITHER AS AN ARDUINO SHIELD
OR GENERIC INTERFACE ON 14 PIN
CONNECTOR J8.

Fig. 17



MCU_5V
R16
124
5V POWER
PRESENT LED
D2
APD3224SGC-F01
DGND
MTG2
HOLE FOR
BOARD STAND OFF
MTG3
HOLE FOR
BOARD STAND OFF
MTG4
HOLE FOR
BOARD STAND OFF
MTG5
HOLE FOR
BOARD STAND OFF
J11
CON8
RFU
IOREF
BTN_
nRESET
3.3V
VIN_12V
J13
CON6
A0
A1
A2
A3
A4
A5
J10
CON10
D3/SCL
D2/SDA
AREF
IO13
IO12
IO11
IO10
IO9
IO8
MSM_ON_OFF
MSM_RTS
MSM_DTR
MSM_nRESET
J12
CON8
D7
D6
D5
D4
D3/SCL
D2/SDA
D1/TX
D0/RX
MSM_DIN
MSM_DOUT
J16
CON6
MISO
SCK
BTN_nRESET
MOSI
USE THIS
HEADER
AND
PROVIDED
14 PIN CABLE
TO CONNECT
TO ANY MCU
OR CPU
DEVELOPMENT
KIT
J8
MFR PN?
4V0
MSM_IO_VREF
MSM_nRESET
MSM_DIO2
MSM_DIO3
MSM_ADC1
MSM_RTS
MSM_CTS
MSM_DTR
MSM_ON_OFF
MSM_DIN
MSM_DOUT
MSM_ON_nSLEEP
IDC CABLE P/N
H3AAS-1406G
C5
10uF

*Fig. 18*


VCC5V_USB
U4
FT232RL
C8
0.1uF
DGND
VCC
VCCIO
SERIAL_TX
SERIAL_RX
SERIAL_RTS
SERIAL_CTS
SERIAL_DTR
TXD
RXD
RTS#
CTS#
DTR#
DSR#
DCD#
RI#
CBUS0
CBUS1
CBUS2
CBUS3
CBUS4
RESET#
USBDM
USBDP
OSCI
OSCO
3V3OUT
NC
NC
TEST
GND
GND
GND
AGND
DGND
DEBUG USBM
DEBUG USBP
VCC5V_USB
J14
MINI-B
2 SH
3 SH
4 SH
5 SH
DGND
DGND
C9
0.1uf
DGND
VCC5V_USB
R17
124
5V POWER
PRESENT LED
D3
APD3224SGC-F01
DGND

*Fig. 19*


VIN_12V
C10
0.1uF
C11
10uF
DGND
VREG5
C12
0.47uF
DGND
J15
BARREL
JACK
VIN_12V
U5
TPS54229DDA
VIN
VREG5
VBST
SW
EN
SS
GND
TAB
VFB
C13
0.1uF
C14
TDK_VLC6045
SW
R18
10K
ENABLE
DGND
SOFTSTART
C18
0.1uF
DGND
DGND
VOLTAGE
FEED BACK
VOUT=
0.765 x (1+R1/R2)
ERJ-3EKF9312V
R1
93.1K
R2
22.1K
DGND
CX
22pF
C15
10uF
C16
10uF
C17
10uF
4V0
DGND
4V0
R20
124
4V POWER
PRESENT
LED
D5
APD322-
4SGC-F01
DGND
VIN_12V
R19
1K
12V POWER
PRESENT LED
D4
APD3224SGC-F01
DGND

# EMBEDDED WIRELESS MODEM

## RELATED APPLICATIONS

The present application claims the benefit of U.S. Provisional Application No. 61/936,651 filed Feb. 6, 2014, which is incorporated herein in its entirety by reference.

## FIELD OF THE INVENTION

The present invention is generally directed to embedded wireless modems. More specifically, the present invention is directed to improved, space-efficient embedded cellular modems for machine-to-machine communication.

## BACKGROUND OF THE INVENTION

Wireless modems, and in particular, cellular modems, may be embedded in remotely-located machines such as meters, automatic teller machines (ATMs), temperature monitors, and so on, to enable wireless communication between the remotely-located "machine" and another "machine", such as a computer server. Such machine-to-machine (M2M) communications facilitate remote monitoring of devices, including data collection, in a number of applications and industries, including agriculture, security, oil and gas, property management, and so on.

While the use of embedded cellular modems in such M2M applications is generally known, presently-used modems remain relatively expensive, typically require a large footprint and may not be designed to be integrated with the latest standards of technology.

## SUMMARY OF THE INVENTION

Embodiments of the invention comprise various space-efficient, embedded cellular modems for use in M2M applications. In an embodiment, cellular modems of the invention include a cellular transceiver module, U.FL antenna port, power management electronics, level shifter electronics, and an interface, all in an XBee® form factor. The embedded cellular modem may be configured to operate on a CDMA, GSM, or other cellular network.

Embedded cellular modems of the invention add robust cellular connectivity to M2M devices, and in the case of pre-certified modems, avoid the cost, delay and hassle of obtaining federal and carrier certifications. In an embodiment, modems of the invention comply with the XBee interface standard, optimized for 1×RTT, or other cellular networks, thereby minimizing costs of hardware and network access.

Other embodiments of the invention include embedded cellular modem kits which include an embedded cellular modem, baseboard, antenna, communications cable, and power supply.

An embodiment comprises a space-efficient cellular modem device for machine-to-machine communications that includes: a multi-layer printed circuit board defining a top side and a bottom side and including a first circuit layer adjacent the top side, a second circuit layer adjacent the bottom side, a ground plane layer, and a power plane layer, the ground and power plane layers located between the first and second circuit layers; a cellular transceiver module configured to communicate over a cellular wireless cellular network, the cellular transceiver module comprising a processor and attached to a top side of the multi-layer printed circuit board; electrical power-management components



attached to the multi-layer printed circuit board, the power-management components in electrical communication with the cellular transceiver module; a first plurality of electrically-conductive pins in electrical connection with the cellular transceiver module and aligned along a first pin axis to form a first row of pins, each of the first plurality of pins extending outwardly and away from the bottom side of the multi-layer printed circuit board; a second plurality of electrically-conductive pins in electrical connection with the cellular transceiver module and aligned along a second pin axis to form a second row of pins, each of the second plurality of pins extending outwardly and away from the bottom side of the multi-layer printed circuit board a communications port, the second row of pins located opposite the first row of pins; and a communications port in electrical communication with the cellular transceiver module, the communications port configured to receive and transmit communication signals over the cellular wireless network.

Another embodiment comprises a space-efficient cellular modem device for machine-to-machine communications that includes: a multi-layer printed circuit board defining a top side and a bottom side and including a circuit layer, a ground plane layer and a power plane layer, the top side of the multi-layer printed circuit board defining a top-side surface area; a cellular transceiver module configured to communicate over a cellular wireless cellular network, the cellular transceiver module comprising a housing defining a top-side surface area and attached to a top side of the multi-layer printed circuit board, the top-side surface area of the cellular transceiver module being in a range of 50% to 100% of the top-side surface area of the multi-layer printed circuit board; electrical power-management components attached to the multi-layer printed circuit board, the power-management components in electrical communication with the cellular transceiver module; a first row of electrically-conductive pins in electrical connection with the cellular transceiver module, each of the pins extending outwardly and away from the bottom side of the multi-layer printed circuit board; a second row of electrically-conductive pins in electrical connection with the cellular transceiver module, each of the pins extending outwardly and away from the bottom side of the multi-layer printed circuit board; an antenna port in electrical communication with the cellular transceiver module, the communications port configured to receive and transmit communication signals over the cellular wireless network.

## BRIEF DESCRIPTION OF THE FIGURES

The invention can be understood in consideration of the following detailed description of various embodiments of the invention in connection with the accompanying drawings, in which:

FIG. **1** depicts an embodiment of an embedded cellular modem, according to an embodiment of the invention;

FIG. **2** depicts a block diagram of the embedded cellular modem of FIG. **1**;

FIGS. **3***a* and **3***b* depict a circuit diagram of the embedded cellular modem of FIGS. **1** and **2**;

FIG. **4** depicts pin connectors and receiver of the embedded cellular modem of FIG. **1**;

FIG. **5** depicts a base board compatible with the embedded cellular modem of FIG. **1**;

FIG. **6** depicts a multi-layer PC board assembly of the embedded cellular modem of FIG. **1**;

FIG. **7** depicts a CDMA EV-DO enabled embodiment of an embedded cellular modem, according to an embodiment of the invention;

FIG. **8** depicts a PC board with connector locations of the embedded cellular modem of FIG. **7**;

FIG. **9** depicts a GSM enabled embodiment of an embedded cellular modem, according to an embodiment of the invention;

FIG. **10** depicts a PC board with connector locations of the embedded cellular modem of FIG. **9**;

FIGS. **11***a*-**11***g* depict various view of the embedded cellular modem of FIG. **1**;

FIGS. **12***a*-*g* depict various views of the embedded cellular modem of FIG. **7**;

FIGS. **13***a*-*g* depict various views of the embedded cellular modem of FIG. **9**;

FIG. **14** depicts a development kit, according to an embodiment of the invention; and

FIGS. **15**-**19** depict electrical schematics of the development kit of FIG. **14**.

While the invention is amenable to various modifications and alternative forms, specifics thereof have been shown by way of example in the drawings and will be described in detail. It should be understood, however, that the intention is not to limit the invention to the particular embodiments described. On the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the invention as defined by the appended claims.

## DETAILED DESCRIPTION

Referring to FIGS. **1**-**3***b*, an embodiment of an embedded cellular modem **100** is depicted. In an embodiment, cellular modem **100** includes printed-circuit (PC) board **102**, cellular transceiver module **104**, communication port **106**, which may comprise an antenna port **106**, power management and level shifter electronics **108**, pin connectors **110** and interface **112**.

As will be described further below, in an embodiment, PC board **102** may comprise a multi-layer board having multiple sub-boards electrically connected by inter-board vias.

In an embodiment cellular transceiver module **104** comprises a cellular transceiver configured to communicate over a cellular network, such as a CDMA network, including 1×RTT and EVDO networks, GSM networks, including GPRS, UMTS, HSPA+ and other cellular networks. In other embodiments, module **104** may communicate non-cellular RF networks.

In a specific embodiment, cellular transceiver module **104** comprises a Telit CE910-Dual 1×RTT communications module; in other embodiments, cellular transceiver module **104** comprises a Telit DE 910 Dual module, GE910 Quad, and LE 910 for CDMA EV-DO networks, GSM networks, and LTE networks, respectively. In an embodiment, cellular transceiver module **104** comprises a processor.

In an embodiment, antenna port **106** may comprise a U.FL antenna port configured to interface with a micro antenna cable. Although a single antenna port is depicted in FIG. **1**, additional antenna ports **106** may be present, as described further below. In an embodiment, antenna port **106** may comprise an antenna port other than a U.FL antenna port. The use of micro-coaxial cables and antenna ports facilitates universal antenna options off-the-module.



Power management and level shifter electronics **108** are located on PC board **102** and are described in further detail in FIGS. **3***a* and **3***b*, an electrical schematic of embedded cellular modem **100**.

Embodiments of embedded cellular modem **100** may be configured for use in CDMA 1×RTT.

Referring also to FIG. **4**, pin connectors **110**, as depicted, may comprise two 10-pin connectors, **110***a* and **110***b*, having a 2 mm pitch, so as to comprise an XBee form factor. The ten pin connectors are configured to fit into corresponding female receptacles, such as receptacles R, depicted. In an embodiment, and as depicted, pin connectors **110** may comprise surface mount pins.

Referring also to FIG. **5**, pin connectors **110** may be electrically connected, such as by soldering, to base PC board **116**. In an embodiment, PC board **116** defines an envelope dimension of 33.60 mm×29.00 mm, with pin connections distributed about PC board **102** as depicted.

Referring to FIG. **6**, the compact, space-efficient embedded cellular modem **100** achieves the XBee form factor by utilizing a multi-layer PC board. In an embodiment, PC board **102** comprises a multi-layer PC board including a silkscreened and solder-masked top side, a first layer (Layer 1) comprising a circuit top side, a second layer (Layer 2) comprising a ground plane, a third layer (Layer 3) comprising a power plane, a fourth layer (Layer 4) comprising a circuit bottom side, and finally, a silkscreened/solder-masked bottom side.

In an embodiment, and as depicted, PC board **102** as assembled defines a height of only 0.062 in+/−0.007 in.

Such a multi-layer, or 4-layer in this embodiment, allows for efficient spacing of surface-mounted components, connectors, and interfaces for the XBee form factor.

Referring to FIG. **7**, an embodiment of embedded cellular modem **100** configured to operate on a CDMA EV-DO network is depicted in a block diagram. In this embodiment, modem **100** includes a transceiver **104** that is configured for the EV-DO network, which in an embodiment comprises a Telit module DE910-DUAL. Further, this embodiment includes a pair of antenna ports **106**. In an embodiment, three antenna ports **106**, two of which are located at a top side of PC board **102**, and one at a bottom side of PC board **102**.

FIG. **8** is a mechanical drawing of PC board **102** of an EV-DO modem **100** showing locations of connectors. Such a drawing may be used to assist a designer in knowing where to align mating connectors on their baseboard as well as physical routing of RF cables inside their end product.

Referring to FIG. **9**, an embodiment of embedded cellular modem **100** configured to operate on a GPRS network is depicted in a block diagram. In this particular embodiment, modem **100** includes a micro-SIM slot **120**. In an embodiment, micro-SIM slot **120** may be on a bottom side of PC board **120**.

FIG. **10** is a mechanical drawing of PC board **102** of a GSM-GPRS modem **100** showing locations of connectors. Such a drawing may be used to assist a designer in knowing where to align mating connectors on their baseboard as well as physical routing of RF cables inside their end product.

Embodiments of embedded cellular modems configured for a CDMA network are depicted in FIGS. **11***a* to **11***g*; embodiments of embedded cellular modems configured for a CDMA EV-DO network are depicted in FIGS. **12***a* to **12***g*; and embodiments of embedded cellular modems configured for a GSM GPRS network are depicted in FIGS. **13***a* to **13***g*.

Embodiments of the invention may also comprise an LTE-capable modem **100**.

As is evident from the above-described figures, embodiments of the invention provide a number of unique features and benefits. The space-efficient size of embedded cellular modem **100** is enabled by the use of surface mount connectors to meet XBee pinout requirements while freeing up surface area on a topside of the modem and its PC board. The use of solder-masked vias support high-volume manufacturing of small geometry board features under BGA components. Further, the use of a micro-SIM card slot on an XBee-sized board provides unique advantages over known modems.

PCB panel design using a combination of scored edges and routered edges supports low cost, high volume PCB manufacturing and subsequent module assembly. Further, the multi-layer stackup approach not only minimizes size and cost, but also maximizes RF performance, such as minimizing signal loss and improving RX sensitivity.

GPS and GLONASS positioning support in an XBee-sized board is also unique, as is the ability to support antenna diversity in an XBee form factor.

In addition to the advantages offered by embodiments of embedded cellular modem **100** as described above, embodiments of the invention also include a cellular modem kit.

Referring to FIG. **14**, a block diagram of an assembled development kit is depicted. In an embodiment, the kit includes cellular modem **100** with debugging headers, power management electronics supplied by a power source (depicted as a 12V source). Other components include a USB Mini-B connected to modem **100**, another USB Mini-B interfacing with a MUX via a UART to USB interface, an universal CPU connection, and an Arduino Shield interface.

Details of the block diagram are further depicted and described in the schematic diagrams of FIGS. **15-19**.

Embodiments of the invention also include algorithms for sending SMS messages using embedded cellular modem **100**.

The embodiments above are intended to be illustrative and not limiting. Additional embodiments are within the claims. In addition, although aspects of the present invention have been described with reference to particular embodiments, those skilled in the art will recognize that changes can be made in form and detail without departing from the spirit and scope of the invention, as defined by the claims.

Persons of ordinary skill in the relevant arts will recognize that the invention may comprise fewer features than illustrated in any individual embodiment described above. The embodiments described herein are not meant to be an exhaustive presentation of the ways in which the various features of the invention may be combined. Accordingly, the embodiments are not mutually exclusive combinations of features; rather, the invention may comprise a combination of different individual features selected from different individual embodiments, as understood by persons of ordinary skill in the art.

Any incorporation by reference of documents above is limited such that no subject matter is incorporated that is contrary to the explicit disclosure herein. Any incorporation by reference of documents above is further limited such that no claims included in the documents are incorporated by reference herein. Any incorporation by reference of documents above is yet further limited such that any definitions provided in the documents are not incorporated by reference herein unless expressly included herein.

For purposes of interpreting the claims for the present invention, it is expressly intended that the provisions of Section 112, sixth paragraph of 35 U.S.C. are not to be invoked unless the specific terms "means for" or "step for" are recited in a claim.

What is claimed:

**1**. A space-efficient cellular modem device for machine-to-machine communications, the modem device comprising:

a multi-layer printed circuit board defining a top side and a bottom side and including a first circuit layer adjacent the top side, a second circuit layer adjacent the bottom side, a ground plane layer, and a power plane layer, the ground and power plane layers located between the first and second circuit layers;

a cellular transceiver module configured to communicate over a cellular wireless cellular network, the cellular transceiver module comprising a processor and attached to a top side of the multi-layer printed circuit board;

electrical power-management components attached to the multi-layer printed circuit board, the power-management components in electrical communication with the cellular transceiver module;

a first plurality of electrically-conductive pins in electrical connection with the cellular transceiver module and aligned along a first pin axis to form a first row of pins, each of the first plurality of pins extending outwardly and away from the bottom side of the multi-layer printed circuit board;

a second plurality of electrically-conductive pins in electrical connection with the cellular transceiver module and aligned along a second pin axis to form a second row of pins, each of the second plurality of pins extending outwardly and away from the bottom side of the multi-layer printed circuit board, the second row of pins located opposite the first row of pins; and

a communications port in electrical communication with the cellular transceiver module, the communications port configured to receive and transmit communication signals over the cellular wireless network.

**2**. The cellular modem device of claim **1**, wherein the cellular wireless cellular network is a CDMA network or a GSM network.

**3**. The cellular modem device of claim **1**, wherein the communications port comprises an antenna port, and the cellular modem further comprises an antenna.

**4**. The cellular modem device of claim **1**, wherein each of the first plurality of pins and the second plurality of pins consists of ten pins.

**5**. The cellular modem device of claim **1**, wherein the modem device conforms to an XBee form factor.

**6**. The cellular modem device of claim **1**, wherein a length of the cellular modem device does not exceed 40 mm and the width of the cellular modem device does not exceed 35 mm.

**7**. The cellular modem device of claim **6**, wherein the length does not exceed 34 mm and the width does not exceed 29 mm.

**8**. The cellular modem device of claim **1**, wherein the layers of the printed circuit board are electrically connected via inter-layer vias.

**9**. The cellular modem device of claim **1**, further comprising a micro-SIM card slot.

**10**. A space-efficient cellular modem device for machine-to-machine communications, the modem device comprising:

a multi-layer printed circuit board defining a top side and a bottom side and including a circuit layer, a ground

plane layer and a power plane layer, the top side of the multi-layer printed circuit board defining a top-side surface area;

a cellular transceiver module configured to communicate over a cellular wireless cellular network, the cellular transceiver module comprising a housing defining a top-side surface area and attached to a top side of the multi-layer printed circuit board, the top-side surface area of the cellular transceiver module being in a range of 50% to 100% of the top-side surface area of the multi-layer printed circuit board;

electrical power-management components attached to the multi-layer printed circuit board, the power-management components in electrical communication with the cellular transceiver module;

a first row of electrically-conductive pins in electrical connection with the cellular transceiver module, each of the pins extending outwardly and away from the bottom side of the multi-layer printed circuit board;

a second row of electrically-conductive pins in electrical connection with the cellular transceiver module, each of the pins extending outwardly and away from the bottom side of the multi-layer printed circuit board;

an antenna port in electrical communication with the cellular transceiver module, the communications port configured to receive and transmit communication signals over the cellular wireless network.



**11**. The cellular modem device of claim **10**, further comprising an antenna connected to the antenna port.

**12**. The cellular modem device of claim **10**, wherein the cellular wireless cellular network is a CDMA network or a GSM network.

**13**. The cellular modem device of claim **10**, further comprising a mini-USB interface.

**14**. The cellular modem device of claim **10**, wherein each of the first row of pins and the second row of pins consists of ten pins.

**15**. The cellular modem device of claim **10**, wherein the modem device conforms to an XBee form factor.

**16**. The cellular modem device of claim **10**, wherein a length of the cellular modem device does not exceed 40 mm and the width of the cellular modem device does not exceed 35 mm.

**17**. The cellular modem device of claim **16**, wherein the length does not exceed 34 mm and the width does not exceed 29 mm.

**18**. The cellular modem device of claim **10**, wherein the layers of the printed circuit board are electrically connected via inter-layer vias.

**19**. The cellular modem device of claim **10**, further comprising a micro-SIM card slot.

**20**. The cellular modem device of claim **10**, wherein a height of the multi-layer printed circuit board does not exceed 0.07 inches.

* * * * *

US009838066B2

(12) **United States Patent**
**Larson et al.**

(10) **Patent No.: US 9,838,066 B2**
(45) **Date of Patent: Dec. 5, 2017**

(54) **EMBEDDED WIRELESS MODEM**

(71) Applicant: **NimbeLink Corp.**, Plymouth, MN (US)

(72) Inventors: **Kurt T. Larson**, Plymouth, MN (US); **Christopher J. Elmquist**, Mahtomedi, MN (US)

(73) Assignee: **NimbeLink Corp.**, Plymouth, MN (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/350,205**

(22) Filed: **Nov. 14, 2016**

(65) **Prior Publication Data**

US 2017/0141809 A1 May 18, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 14/616,118, filed on Feb. 6, 2015, now Pat. No. 9,497,570.

(60) Provisional application No. 61/936,651, filed on Feb. 6, 2014.

(51) **Int. Cl.**
***H04B 1/40*** (2015.01)
***H04W 4/00*** (2009.01)
***H04M 1/02*** (2006.01)

(52) **U.S. Cl.**
CPC ............ ***H04B 1/40*** (2013.01); ***H04M 1/0277*** (2013.01); ***H04W 4/005*** (2013.01)

(58) **Field of Classification Search**
CPC ....... H04B 1/40; H04W 4/005; H04M 1/0277
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

9,497,570 B2 * 11/2016 Larson .................. H04W 4/005
2008/0160931 A1 * 7/2008 Rofougaran ............ H01L 23/66
455/90.3

* cited by examiner

*Primary Examiner* — Lewis West
(74) *Attorney, Agent, or Firm* — Christensen, Fonder, Dardi & Herbert PLLC

(57) **ABSTRACT**

A space-efficient cellular modem device for machine-to-machine communications that includes: a multi-layer printed circuit board defining a top side and a bottom side and including a first circuit layer adjacent the top side, a second circuit layer adjacent the bottom side, a ground plane layer, and a power plane layer, the ground and power plane layers located between the first and second circuit layers; a cellular transceiver module configured to communicate over a cellular wireless cellular network; electrical power-management components attached to the multi-layer printed circuit board, the power-management components in electrical communication with the cellular transceiver module; first and second rows of pins in electrical communication with the cellular transceiver; and a communications port.

**29 Claims, 21 Drawing Sheets**




4 LAYER STACK-UP

Fig. 1



Fig. 2


106
U.FL CONNECTION
100
104
TELIT
CE910-DUAL
108
POWER
MANAGEMENT
110a
110b
LEVEL
SHIFTERS
108
XBEE
INTERFACE
112


U4
TPS73801DCQR
VCC_3V5-4V3
IN
OUT
EN
GND
GND
NR/FB
C18
10uF
0603
DGND
R70
9.76K
R71
4.02K
VCC_3V4-4V2
C19
10uF
0603
VIO_MODEM
VCC_REF
C2
0.1uF
0603
U2
1009743
VCCB
VCCA
VSS
OE
DOUT
CTS/DIO7
DIN
DTR/SLEEP_RQ/DI8
RTS/AD6/IO6
RX_MODEM
CTS_MODEM
TX_MODEM
DTR_MODEM
DSR_MODEM
DCD_MODEM
RTS_MODEM
RING_MODEM
C3
0.1uF
0603
100
U1
Telit CE910
ON/OFF
RESET_nIN
ADC1
ON_OFF
HW_SHUTDOWN
ADC_IN1
C104/RXD
C103/TXD
C106/CTS
C108/DTR
C107/DSR
C109/DCD
C105/RTS
C125/RING
EAR+
EAR-
MIC+
MIC-
RX_AUX
TX_AUX
SIMVCC
SIMMIO
SIMCLK
SIMnRST
RUIMVCC
RUIMIO
RUIMCLK
RUIMRST
VUSB
USB_D+
USB_D-
104
R69
0 OHM
0603
C1
0.1uF
0603
VBATT_PA
VBATT
VAUX/PWRMON
VRTC
GND
J1
VCC_3V5-4V3
DOUT
DIN
DO8
RESTE_nIN
PWM0/RSSI
PWM1
Reserved
DTR/SLEEP_RQ/DI8
DGND
VUSB
USB_D+
USB_D-
Socket_10
VCC_REF
Commissioning PIN
J2
ON_OFF
ADC1
DIO2
DIO3
RTS/AD6/IO6
DIO5
VREF
ON/nSLEEP
CTS/DIO7
DIO4

FIG. 3A


VCC_3V4-4V2
C4 10uF 0603
C5 10uF 0603
C6 10uF 0603
C7 10uF 0603
C8 10uF 0603
C9 10uF 0603
C11 10uF 0603
C12 10uF 0603
C13 10uF 0603
DGND
VCC_REF
L1 43nH
X1 1002292 U.FL-R-SMT(10)
X2 U.FL-R-SMT(10)
X3 U.FL-R-SMT(10)
C20 56pF
D1 Green LTST-C170GKT
R72 330
Q1 N-CH FDV301N (RoHS)
ON/nSLEEP
DIO3
DIO2
SIMMIO
C17 33pF 0603
R73 15.0K
J3 47388-3001 SIM CARD SLOT
C14 1uF 0603
C15 33pF 0603
C16 33pF 0603
SIMVCC
SIMnRST
SIMCLK
GND
Antenna
Reserved
GPIO_10
GPIO_09
GPIO_08
GPIO_07
GPIO_06
GPIO_05
GPIO_04
GPIO_03
GPIO_02
GPIO_01
DVI_WAO
DVI_TX
DVI_RX
DVI_CLK
104
R74 0 OHM

FIG. 3B



1.60
4.30
110
2.00
(n-1) x 2.00
0.50x0.20
n x 2.00 + 0.50
R
2.40
110
2.50
Ø0.80±0.05
110
2.00
(n-1) x 2.00


Fig. 4

Fig. 5



116
2.00
1
20
33.60
7.75
10
11
3.56
25.56
29.00

Fig. 6




4 LAYER STACK-UP

Fig. 7


106
CELLULAR
U.FL CONNECTIONS
100
TELIT
DE910-DUAL
106
GPS AND
GLONASS
POWER
MANAGEMENT
LEVEL
SHIFTERS
XBEE
INTEFACE

Fig. 8


106
1
20
2.00
DIVERSITY
116
33.60
PRIMARY
33.60
31.75
7.75
106
10
11
GPS
3.56
3.15
10.85
18.10
25.45
25.56
29.00

*Fig. 9*


U.FL CONNECTIONS
100
120
TELIT
DE910-DUAL
MICRO-SIM
SLOT
POWER
MANAGEMENT
LEVEL
SHIFTERS
XBEE
INTEFACE

*Fig. 10*


106
1
20
X1
2.00
116
33.60
MICRO
SIM
SLOT
10
11
7.75
120
3.56
25.56
29.00

Fig. 11a



Fig. 12a



Fig. 13a





Fig. 13b



Fig. 12b



Fig. 11b

Fig. 11c



Fig. 12c



Fig. 13c



Fig. 11d



Fig. 12d



Fig. 13d



Fig. 11e



Fig. 12e



Fig. 13e



Fig. 11f



Fig. 12f



Fig. 13f



Fig. 11g



Fig. 12g



Fig. 13g



*Fig. 14*


12V POWER
USB MINI-B
USB MINI-B
CE910 USB
UART TO USB
ARDUINO SHIELD INTERFACE
POWER MANAGEMENT
MUX
UART
UNIVERSAL CPU CONNECTION
DEBUG HEADERS
SKYWIRE CELLULAR MODEM
U.FL
DIPOLE ANTENNA

Fig. 15


J2
MODEM MAIN POWER MEASUREMENT POINT
R4
0.1 OHMS
RL122OS-
R10-F
4VO
4V
C2
0.1uF
C1
+100uF
DGND
J3
DEBUG SOCKET 0.100"
U1
SKYWIRE
CELLULAR
MODEM
XBEE SOCKET
J4
DEBUG SOCKET
0.100"
MSM_IO_
VREF2
J1
MODEM VREF POWER
MEASUREMENT POINT
R3
0.1 OHMS
RL122OS-
R10-P
MSM_IO_
VREF
PRESS BUTTON
FOR >1SECOND
TO POWER
MODEM ON
S1
DGND
VCC
DOUT
DIN
GND
RESET
VUSB
USB_D+
USB_D-
DTR
GND
ON_OFF
ADC1
DIO2
DIO3
RTS
GND
IO_REF
ON/nSLEEP
CTS
GND
MSM_DOUT
MSM_DIN
MSM_nRESET
MSM_USB_VBUS
MSM_USB_D+
MSM_USB_D-
MSM_DTR
R6
10K
DGND
MSM_ON_OFF
MSM_ADC1
MSM_DIO2
MSM_DIO3
MSM_RTS
MSM_ON
_nSLEEP
MSM_CTS
4V
R5
124
ACTIVITY
LED D1
APD3224
SGC-F01
R7
10K
DGND
Q1
N-CH
D
G
S
J5
MINI-B
MSM_USB_VBUS
MSM_USB_D-
MSM_USB_D+
SH
MTG1
HOLE FOR SMA
ANTENNA MOUNT

*Fig. 16*


MSM_IO_VREF
R8
10K
SERIAL MODEM
U2
CD74AC541M
20
VCC
OE1
1
19
OE2
MSM_DIN
MSM_RTS
MSM_DTR
SERIAL_RX
SERIAL_CTS
Y0
Y1
Y2
Y3
Y4
Y5
Y6
Y7
A0
A1
A2
A3
A4
A5
A6
A7
GND
SERIAL_TX
SERIAL_RTS
SERIAL_DTR
MSM_DOUT
MSM_CTS
DGND
THIS BUFFER ROUTES USB SERIAL PORT SIGNALS TO MODEM UART AND DISABLES ONBOARD MCU.
MSM_IO_VREF
VCC5V_USB
D6
MBR0530
MCU_5V
D7
MBR0530
J6
3 PIN HEADER
SERIAL MODEM
DGND
THIS HEADER SELECTS BEHAVIOR OF USB SERIAL PORT, SHORTING PINS 1 AND 2 TIES MODEM DIRECTLY TO SERIAL PORT, ARDIUNO AND EXTERNAL CPU ON J6 MUST NOT BE USED. LEAVING J6 JUMPER OFF ALLOWS FOR ARDUINO OR EXTERNAL CPU CONNECTION. REMOVING JUMPER FROM ALL PINS ON J6 ALLOWS EXTERNAL CPU/MCU TO BE CONNECTED DIRECTLY TO MODEM AT TTL LEVELS EITHER AS AN ARDUINO SHIELD OR GENERIC INTERFACE ON 14 PIN CONNECTOR J8.

Case: 24-2292 Document: 10 Page: 156 Filed: 11/05/2024

*Fig. 17*



Case: 24-2292 Document: 10 Page: 157 Filed: 11/05/2024

Fig. 18



Case: 24-2292 Document: 10 Page: 158 Filed: 11/05/2024

*Fig. 19*



# EMBEDDED WIRELESS MODEM

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation of U.S. patent application Ser. No. 14/616,118, filed Feb. 6, 2015, which claims the benefit of U.S. Provisional Application No. 61/936,651 filed Feb. 6, 2014, both of which are hereby incorporated by reference herein in their entireties.

## FIELD OF THE INVENTION

The present invention is generally directed to embedded wireless modems. More specifically, the present invention is directed to improved, space-efficient embedded cellular modems for machine-to-machine communication.

## BACKGROUND OF THE INVENTION

Wireless modems, and in particular, cellular modems, may be embedded in remotely-located machines such as meters, automatic teller machines (ATMs), temperature monitors, and so on, to enable wireless communication between the remotely-located "machine" and another "machine", such as a computer server. Such machine-to-machine (M2M) communications facilitate remote monitoring of devices, including data collection, in a number of applications and industries, including agriculture, security, oil and gas, property management, and so on.

While the use of embedded cellular modems in such M2M applications is generally known, presently-used modems remain relatively expensive, typically require a large footprint and may not be designed to be integrated with the latest standards of technology.

## SUMMARY OF THE INVENTION

Embodiments of the invention comprise various space-efficient, embedded cellular modems for use in M2M applications. In an embodiment, cellular modems of the invention include a cellular transceiver module, U.FL antenna port, power management electronics, level shifter electronics, and an interface, all in an XBee® form factor. The embedded cellular modem may be configured to operate on a CDMA, GSM, or other cellular network.

Embedded cellular modems of the invention add robust cellular connectivity to M2M devices, and in the case of pre-certified modems, avoid the cost, delay and hassle of obtaining federal and carrier certifications. In an embodiment, modems of the invention comply with the XBee interface standard, optimized for 1×RTT, or other cellular networks, thereby minimizing costs of hardware and network access.

Other embodiments of the invention include embedded cellular modem kits which include an embedded cellular modem, baseboard, antenna, communications cable, and power supply.

An embodiment comprises a space-efficient cellular modem device for machine-to-machine communications that includes: a multi-layer printed circuit board defining a top side and a bottom side and including a first circuit layer adjacent the top side, a second circuit layer adjacent the bottom side, a ground plane layer, and a power plane layer, the ground and power plane layers located between the first and second circuit layers; a cellular transceiver module configured to communicate over a cellular wireless cellular network, the cellular transceiver module comprising a processor and attached to a top side of the multi-layer printed circuit board; electrical power-management components attached to the multi-layer printed circuit board, the power-management components in electrical communication with the cellular transceiver module; a first plurality of electrically-conductive pins in electrical connection with the cellular transceiver module and aligned along a first pin axis to form a first row of pins, each of the first plurality of pins extending outwardly and away from the bottom side of the multi-layer printed circuit board; a second plurality of electrically-conductive pins in electrical connection with the cellular transceiver module and aligned along a second pin axis to form a second row of pins, each of the second plurality of pins extending outwardly and away from the bottom side of the multi-layer printed circuit board a communications port, the second row of pins located opposite the first row of pins; and a communications port in electrical communication with the cellular transceiver module, the communications port configured to receive and transmit communication signals over the cellular wireless network.



Another embodiment comprises a space-efficient cellular modem device for machine-to-machine communications that includes: a multi-layer printed circuit board defining a top side and a bottom side and including a circuit layer, a ground plane layer and a power plane layer, the top side of the multi-layer printed circuit board defining a top-side surface area; a cellular transceiver module configured to communicate over a cellular wireless cellular network, the cellular transceiver module comprising a housing defining a top-side surface area and attached to a top side of the multi-layer printed circuit board, the top-side surface area of the cellular transceiver module being in a range of 50% to 100% of the top-side surface area of the multi-layer printed circuit board; electrical power-management components attached to the multi-layer printed circuit board, the power-management components in electrical communication with the cellular transceiver module; a first row of electrically-conductive pins in electrical connection with the cellular transceiver module, each of the pins extending outwardly and away from the bottom side of the multi-layer printed circuit board; a second row of electrically-conductive pins in electrical connection with the cellular transceiver module, each of the pins extending outwardly and away from the bottom side of the multi-layer printed circuit board; an antenna port in electrical communication with the cellular transceiver module, the communications port configured to receive and transmit communication signals over the cellular wireless network.

## BRIEF DESCRIPTION OF THE FIGURES

The invention can be understood in consideration of the following detailed description of various embodiments of the invention in connection with the accompanying drawings, in which:

FIG. **1** depicts an embodiment of an embedded cellular modem, according to an embodiment of the invention;

FIG. **2** depicts a block diagram of the embedded cellular modem of FIG. **1**;

FIGS. **3***a* and **3***b* depict a circuit diagram of the embedded cellular modem of FIGS. **1** and **2**;

FIG. **4** depicts pin connectors and receiver of the embedded cellular modem of FIG. **1**;

FIG. **5** depicts a base board compatible with the embedded cellular modem of FIG. **1**;

FIG. **6** depicts a multi-layer PC board assembly of the embedded cellular modem of FIG. **1**;

FIG. **7** depicts a CDMA EV-DO enabled embodiment of an embedded cellular modem, according to an embodiment of the invention;

FIG. **8** depicts a PC board with connector locations of the embedded cellular modem of FIG. **7**;

FIG. **9** depicts a GSM enabled embodiment of an embedded cellular modem, according to an embodiment of the invention;

FIG. **10** depicts a PC board with connector locations of the embedded cellular modem of FIG. **9**;

FIGS. **11***a*-**11***g* depict various view of the embedded cellular modem of FIG. **1**;

FIGS. **12***a-g* depict various views of the embedded cellular modem of FIG. **7**;

FIGS. **13***a-g* depict various views of the embedded cellular modem of FIG. **9**;

FIG. **14** depicts a development kit, according to an embodiment of the invention; and

FIGS. **15-19** depict electrical schematics of the development kit of FIG. **14**.

While the invention is amenable to various modifications and alternative forms, specifics thereof have been shown by way of example in the drawings and will be described in detail. It should be understood, however, that the intention is not to limit the invention to the particular embodiments described. On the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the invention as defined by the appended claims.

## DETAILED DESCRIPTION

Referring to FIGS. **1-3***b*, an embodiment of an embedded cellular modem **100** is depicted. In an embodiment, cellular modem **100** includes printed-circuit (PC) board **102**, cellular transceiver module **104**, communication port **106**, which may comprise an antenna port **106**, power management and level shifter electronics **108**, pin connectors **110** and interface **112**.

As will be described further below, in an embodiment, PC board **102** may comprise a multi-layer board having multiple sub-boards electrically connected by inter-board vias.

In an embodiment cellular transceiver module **104** comprises a cellular transceiver configured to communicate over a cellular network, such as a CDMA network, including 1×RTT and EVDO networks, GSM networks, including GPRS, UMTS, HSPA+ and other cellular networks. In other embodiments, module **104** may communicate non-cellular RF networks.

In a specific embodiment, cellular transceiver module **104** comprises a Telit CE910-Dual 1×RTT communications module; in other embodiments, cellular transceiver module **104** comprises a Telit DE 910 Dual module, GE910 Quad, and LE 910 for CDMA EV-DO networks, GSM networks, and LTE networks, respectively. In an embodiment, cellular transceiver module **104** comprises a processor.

In an embodiment, antenna port **106** may comprise a U.FL antenna port configured to interface with a micro antenna cable. Although a single antenna port is depicted in FIG. **1**, additional antenna ports **106** may be present, as described further below. In an embodiment, antenna port **106** may comprise an antenna port other than a U.FL antenna port. The use of micro-coaxial cables and antenna ports facilitates universal antenna options off-the-module.



Power management and level shifter electronics **108** are located on PC board **102** and are described in further detail in FIGS. **3***a* and **3***b*, an electrical schematic of embedded cellular modem **100**.

Embodiments of embedded cellular modem **100** may be configured for use in CDMA 1×RTT.

Referring also to FIG. **4**, pin connectors **110**, as depicted, may comprise two 10-pin connectors, **110***a* and **110***b*, having a 2 mm pitch, so as to comprise an XBee form factor. The ten pin connectors are configured to fit into corresponding female receptacles, such as receptacles R, depicted. In an embodiment, and as depicted, pin connectors **110** may comprise surface mount pins.

Referring also to FIG. **5**, pin connectors **110** may be electrically connected, such as by soldering, to base PC board **116**. In an embodiment, PC board **116** defines an envelope dimension of 33.60 mm×29.00 mm, with pin connections distributed about PC board **102** as depicted.

Referring to FIG. **6**, the compact, space-efficient embedded cellular modem **100** achieves the XBee form factor by utilizing a multi-layer PC board. In an embodiment, PC board **102** comprises a multi-layer PC board including a silkscreened and solder-masked top side, a first layer (Layer **1**) comprising a circuit top side, a second layer (Layer **2**) comprising a ground plane, a third layer (Layer **3**) comprising a power plane, a fourth layer (Layer **4**) comprising a circuit bottom side, and finally, a silkscreened/solder-masked bottom side.

In an embodiment, and as depicted, PC board **102** as assembled defines a height of only 0.062 in+/−0.007 in.

Such a multi-layer, or 4-layer in this embodiment, allows for efficient spacing of surface-mounted components, connectors, and interfaces for the XBee form factor.

Referring to FIG. **7**, an embodiment of embedded cellular modem **100** configured to operate on a CDMA EV-DO network is depicted in a block diagram. In this embodiment, modem **100** includes a transceiver **104** that is configured for the EV-DO network, which in an embodiment comprises a Telit module DE910-DUAL. Further, this embodiment includes a pair of antenna ports **106**. In an embodiment, three antenna ports **106**, two of which are located at a top side of PC board **102**, and one at a bottom side of PC board **102**.

FIG. **8** is a mechanical drawing of PC board **102** of an EV-DO modem **100** showing locations of connectors. Such a drawing may be used to assist a designer in knowing where to align mating connectors on their baseboard as well as physical routing of RF cables inside their end product.

Referring to FIG. **9**, an embodiment of embedded cellular modem **100** configured to operate on a GPRS network is depicted in a block diagram. In this particular embodiment, modem **100** includes a micro-SIM slot **120**. In an embodiment, micro-SIM slot **120** may be on a bottom side of PC board **120**.

FIG. **10** is a mechanical drawing of PC board **102** of a GSM-GPRS modem **100** showing locations of connectors. Such a drawing may be used to assist a designer in knowing where to align mating connectors on their baseboard as well as physical routing of RF cables inside their end product.

Embodiments of embedded cellular modems configured for a CDMA network are depicted in FIGS. **11***a* to **11***g*; embodiments of embedded cellular modems configured for a CDMA EV-DO network are depicted in FIGS. **12***a* to **12***g*; and embodiments of embedded cellular modems configured for a GSM GPRS network are depicted in FIGS. **13***a* to **13***g*.

Embodiments of the invention may also comprise an LTE-capable modem **100**.

As is evident from the above-described figures, embodiments of the invention provide a number of unique features and benefits. The space-efficient size of embedded cellular modem **100** is enabled by the use of surface mount connectors to meet XBee pinout requirements while freeing up surface area on a topside of the modem and its PC board. The use of solder-masked vias support high-volume manufacturing of small geometry board features under BGA components. Further, the use of a micro-SIM card slot on an XBee-sized board provides unique advantages over known modems.

PCB panel design using a combination of scored edges and routered edges supports low cost, high volume PCB manufacturing and subsequent module assembly. Further, the multi-layer stackup approach not only minimizes size and cost, but also maximizes RF performance, such as minimizing signal loss and improving RX sensitivity.

GPS and GLONASS positioning support in an XBee-sized board is also unique, as is the ability to support antenna diversity in an XBee form factor.

In addition to the advantages offered by embodiments of embedded cellular modem **100** as described above, embodiments of the invention also include a cellular modem kit.

Referring to FIG. **14**, a block diagram of an assembled development kit is depicted. In an embodiment, the kit includes cellular modem **100** with debugging headers, power management electronics supplied by a power source (depicted as a 12V source). Other components include a USB Mini-B connected to modem **100**, another USB Mini-B interfacing with a MUX via a UART to USB interface, an universal CPU connection, and an Arduino Shield interface.

Details of the block diagram are further depicted and described in the schematic diagrams of FIGS. **15-19**.

Embodiments of the invention also include algorithms for sending SMS messages using embedded cellular modem **100**.

The embodiments above are intended to be illustrative and not limiting. Additional embodiments are within the claims. In addition, although aspects of the present invention have been described with reference to particular embodiments, those skilled in the art will recognize that changes can be made in form and detail without departing from the spirit and scope of the invention, as defined by the claims.

Persons of ordinary skill in the relevant arts will recognize that the invention may comprise fewer features than illustrated in any individual embodiment described above. The embodiments described herein are not meant to be an exhaustive presentation of the ways in which the various features of the invention may be combined. Accordingly, the embodiments are not mutually exclusive combinations of features; rather, the invention may comprise a combination of different individual features selected from different individual embodiments, as understood by persons of ordinary skill in the art.

Any incorporation by reference of documents above is limited such that no subject matter is incorporated that is contrary to the explicit disclosure herein. Any incorporation by reference of documents above is further limited such that no claims included in the documents are incorporated by reference herein. Any incorporation by reference of documents above is yet further limited such that any definitions provided in the documents are not incorporated by reference herein unless expressly included herein.

For purposes of interpreting the claims for the present invention, it is expressly intended that the provisions of



Section 112, sixth paragraph of 35 U.S.C. are not to be invoked unless the specific terms "means for" or "step for" are recited in a claim.

What is claimed:

**1**. A space-efficient cellular modem device for machine-to-machine communications, the modem device comprising:

a multi-layer printed circuit board defining a first side and a second side and including at least four layers, the four layers including a first layer including one or more circuits, a second layer including a ground plane, a third layer including a power plane, and a fourth layer including one or more circuits, wherein the first layer is soldermasked to form the first side of the multi-layer printed circuit board, the second layer is between the first layer and the fourth layer, the third layer is between the first layer and the fourth layer, and the fourth layer is soldermasked to form the second side of the multi-layer printed circuit board;

a cellular transceiver module configured to communicate over a cellular wireless network, the cellular transceiver module comprising a processor and attached to the first side of the multi-layer printed circuit board;

electrical power-management components attached to the multi-layer printed circuit board, the power-management components in electrical communication with the cellular transceiver module;

a first plurality of electrically-conductive pins aligned along a first pin axis to form a first row of pins, each of the first plurality of pins extending outwardly and away from the multi-layer printed circuit board, one or more of the first plurality of electrically-conductive pins in electrical connection with the cellular transceiver module and one or more of the first plurality of electrically-conductive pins in electrical connection with the electrical power-management components;

a second plurality of electrically-conductive pins aligned along a second pin axis to form a second row of pins, each of the second plurality of pins extending outwardly and away from the multi-layer printed circuit board, the second row of pins located opposite the first row of pins; and

a communications port in electrical communication with the cellular transceiver module, the communications port configured to receive and transmit communication signals over the cellular wireless network.

**2**. The space-efficient cellular modem device of claim **1**, wherein the second layer is between the first layer and the third layer.

**3**. The space-efficient cellular modem device of claim **1**, wherein each pin of the second plurality of electrically-conductive pins is opposite a pin of the first plurality of electrically-conductive pins.

**4**. The space-efficient cellular modem device of claim **1**, wherein the pins of the first plurality of electrically-conductive pins are equidistantly spaced from one another, and the pins of the second plurality of electrically-conductive pins are equidistantly spaced from one another.

**5**. The space-efficient cellular modem device of claim **1**, wherein the first plurality of electrically-conductive pins and the second plurality of electrically-conductive pins are surface-mounted pins.

**6**. The space-efficient cellular modem device of claim **1**, wherein the first plurality of electrically-conductive pins and the second plurality of electrically-conductive pins extend from the second side of the multi-layer printed circuit board.

**7**. The cellular modem device of claim **1**, wherein one or more of the first plurality of electrically-conductive pins is

in electrical connection with the cellular transceiver module or is in electrical connection with the electrical power management components.

**8**. The cellular modem device of claim **1**, wherein the cellular wireless network is an LTE network.

**9**. The cellular modem device of claim **1**, wherein the communications port comprises an antenna port, and the cellular modem further comprises an antenna.

**10**. The cellular modem device of claim **1**, wherein each of the first plurality of pins and the second plurality of pins consists of ten pins.

**11**. The cellular modem device of claim **1**, wherein a length of the cellular modem device does not exceed 34 mm and a width of the cellular modem device does not exceed 29 mm.

**12**. The cellular modem device of claim **1**, further comprising a SIM card slot.

**13**. A space-efficient cellular modem device for machine-to-machine communications, the modem device comprising:

a multi-layer printed circuit board defining a first side and a second side and including at least four layers, the four layers including a first layer including one or more circuits, a second layer including a ground plane, a third layer including a power plane, and a fourth layer including one or more circuits, wherein the first layer is soldermasked to form the first side of the multi-layer printed circuit board, the second layer is between the first layer and the fourth layer, the third layer is between the first layer and the fourth layer, and the fourth layer is soldermasked to form the second side of the multi-layer printed circuit board;

a cellular transceiver module configured to communicate over a cellular wireless cellular network, the cellular transceiver module comprising a housing defining a top-side surface area and attached to the first side of the multi-layer printed circuit board, the top-side surface area of the cellular transceiver module being in a range of 50% to 100% of a surface area of the first side of the multi-layer printed circuit board;

electrical power-management components attached to the multi-layer printed circuit board, the power-management components in electrical communication with the cellular transceiver module;

a first plurality of electrically-conductive pins aligned along a first pin axis to form a first row of pins, each of the first plurality of pins extending outwardly and away from the multi-layer printed circuit board, one or more of the first plurality of electrically-conductive pins in electrical connection with the cellular transceiver module and one or more of the first plurality of electrically-conductive pins in electrical connection with the electrical power-management components;

a second plurality of electrically-conductive pins aligned along a second pin axis to form a second row of pins, each of the second plurality of pins extending outwardly and away from the multi-layer printed circuit board, the second row of pins located opposite the first row of pins; and

an antenna port in electrical communication with the cellular transceiver module, the communications port configured to receive and transmit communication signals over the cellular wireless network.

**14**. The cellular modem device of claim **13**, further comprising an antenna connected to the antenna port.

**15**. The cellular modem device of claim **13**, wherein the cellular wireless cellular network is an LTE network.

**16**. The cellular modem device of claim **13**, further comprising a USB interface.

**17**. The cellular modem device of claim **13**, wherein each of the first row of pins and the second row of pins consists of ten pins.

**18**. The cellular modem device of claim **13**, wherein a length of the cellular modem device does not exceed 34 mm and a width of the cellular modem device does not exceed 29 mm.

**19**. The cellular modem device of claim **13**, further comprising a SIM card slot.

**20**. The cellular modem device of claim **13**, wherein a height of the multi-layer printed circuit board does not exceed 0.07 inches.

**21**. A space-efficient cellular modem device for machine-to-machine communications, the modem device comprising:

a multi-layer printed circuit board defining a first side and a second side and including at least four layers, the four layers including a first layer including one or more circuits, a second layer including a planar grounding portion, a third layer including a planar power portion, and a fourth layer including one or more circuits, wherein the first layer is soldermasked to form the first side of the multi-layer printed circuit board, the second layer is between the first layer and the fourth layer, the third layer is between the first layer and the fourth layer, and the fourth layer is soldermasked to form the second side of the multi-layer printed circuit board;

a cellular transceiver module attached to the first side of the multi-layer printed circuit board and configured to communicate over a cellular wireless cellular network, the cellular transceiver module comprising a processor, the processor configured to communicate with a subscriber identity module (SIM); and

electrical power-management components attached to the multi-layer printed circuit board, the power-management components in electrical communication with the cellular transceiver module;

a first plurality of electrically-conductive portions aligned along a first axis to form a first row of electrically conductive portions, one or more of the first plurality of electrically-conductive portions in electrical connection with the cellular transceiver module and one or more of the first plurality of electrically-conductive portions in electrical connection with the electrical power-management components;

a second plurality of electrically-conductive portions aligned along a second axis to form a second row of electrically-conductive portions, the first axis being parallel to the second axis, and the second row of electrically-conductive portions located opposite the first row of electrically-conductive portions; and

a communications port in electrical communication with the cellular transceiver module, the communications port configured to receive and transmit communication signals over the cellular wireless network.

**22**. The space-efficient cellular modem device of claim **21**, wherein the second layer is between the first layer and the third layer.

**23**. The space-efficient cellular modem device of claim **21**, wherein the first plurality of electrically-conductive portions comprises ten pins, and the second plurality of electrically-conductive portions comprises ten pins, and each of the pins of the first plurality of electrically-conductive portions are equidistantly spaced from one another, and each of the pins of the second plurality of electrically-conductive pins are equidistantly spaced from one another.

**24**. The space-efficient cellular modem device of claim **23**, wherein the pins of the first plurality of electrically conductive portions and the pins of the second plurality of electrically conductive portions are surface-mounted pins.

**25**. The cellular modem device of claim **21**, wherein the cellular wireless network is an LTE network.

**26**. The cellular modem device of claim **21**, wherein the communications port comprises an antenna port, and the cellular modem further comprises an antenna.

**27**. The cellular modem device of claim **21**, wherein a length of the cellular modem device does not exceed 34 mm and a width of the cellular modem device does not exceed 29 mm.

**28**. The cellular modem device of claim **21**, further comprising a SIM card slot for receiving the SIM.

**29**. The cellular modem device of claim **21**, further comprising a USB interface.

* * * * *

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-2292

**Short Case Caption:** NimbeLink Corp. v. Digi International, Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 11,746 words.
- [ ] the filing has been prepared using a monospaced typeface and includes ___________ lines of text.
- [ ] the filing contains ___________ pages / ___________ words / ___________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ___________).

Date: 11/05/2024

Signature: /s/Devan V. Padmanabhan

Name: Devan V. Padmanabhan